REVISED, October 1, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-50631
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

ROSARIO REVELES, also known as
Willie Reveles; LUIS REVELES,

                                        Defendants-Appellants.
_____

        Appeals from the United States District Court for the
                    Western District of Texas
_____
                    September 28, 1999

Before REAVLEY, JOLLY, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:


    A jury convicted Rosario "Willie" Reveles and Luis Reveles of

conspiracy and possession with intent to distribute a controlled

substance.    On appeal, Willie does not challenge the jury's

assessment of guilt, but makes several arguments challenging the

constitutionality of his conviction and the calculation of his

sentence.    For the reasons stated below, we find no error with

respect to Willie's convictions or sentencing.    Unlike Willie, Luis

does challenge the sufficiency of the evidence to support his

convictions.    Because we find insufficient evidence to support the

knowledge elements of his conspiracy and possession with intent to distribute convictions, we reverse those convictions.

I

Willie Reveles was involved in a drug conspiracy. According to testimonial evidence offered at trial, Willie approached a man named Luis Gil and offered his services in the drug-related business. Willie informed Gil that he had contacts with shipping companies that could help Gil in shipping large quantities of drugs. Sometime later, Willie began using legitimate freight companies to ship boxes that contained marijuana, but from the outside the boxes looked like ordinary freight.[1] Each of the delivered boxes rested on a pallet, was wrapped in industrial cellophane, and was marked "fragile." Willie told the shipping companies that the boxes contained ceramic goods.

Sometimes, Willie used a forwarding company (SGT) to arrange the details with shipping companies to transport the freight. When dealing with SGT, Willie said that he worked for CC Enterprises--a fictional entity.[2] Typically, a person working for SGT would meet either Willie or his brother, Luis, at the shipping company with the paper work. Luis sometimes delivered the drug-filled boxes to

---

[1]The freight companies that Willie used included Herman Miles Trucking, ABF Freight, and C.F. Motor Freight Co. Willie also used a shipping broker (called a freight forwarding company) to handle the details of the shipping arrangements. This company is named SGT.

[2]Willie also used another fictional corporate name--Timberland--when he dealt with another shipping company.

the shipping company on his own. It is unknown how many times Luis did this, but the evidence supports as few as two times, but not much beyond three.

The illicit drug trafficking was uncovered in April 1996, when a fork lift operator at one of the shipping companies accidentally punctured one of Willie's boxes. Marijuana poured out of the box, and the worker called the police. The police arranged to have the box shipped under controlled supervision to its planned destination. Because the shipment was delayed, Willie called the company who had arranged the shipment (SGT), and asked about the freight's whereabouts. A SGT employee told the police of the inquiry. This, in turn, led the police to discover Willie's identity. Before arresting Willie, however, the police observed two other drug deliveries orchestrated by Willie. The three boxes discovered in these three deliveries contained a total of 1,448 pounds of marijuana.

The second delivery discovered by the police occurred on June 18, 1996. During this delivery, an employee at ABF Freight smelled marijuana in one of the boxes sent by Willie. The employee informed the police, and the police arrested the parties that were to pick up the shipment. In the third delivery discovered by the police, the police were alerted beforehand. They observed Luis drop off the freight at the shipping company. When Luis arrived at the shipping dock, no one was around to accept the freight. After waiting for a short time (approximately ten to twenty minutes),

Luis left his (correct) name, address, and phone number in a note that said he would return later that day. The police then followed Luis to a McDonald's restaurant where he met three men. The three men left in the truck Luis had taken to drop off the box, and Luis left in another automobile.

After further investigation, the authorities discovered that Willie had a Mexican bank account containing $130,000. (Willie reported an income of less than $12,000 for each of the years 1994, 1995, and 1996). Willie, however, did not share his wealth. He only paid his brother Luis fifty dollars for each delivery drop-off.

During the sentencing phase, the court determined that the conspiracy ran from February 1995 through June 1996. The defendants do not dispute this finding. The court then assumed that all shipments made by Willie during this time contained marijuana. Because the shipping company records indicated the weight of each shipment, the court estimated the weight of marijuana in each shipment by multiplying the total shipment weight by sixty-two percent--the average weight percentage of marijuana found in the three discovered deliveries.

The government prosecuted Willie and Luis Reveles in a joint trial. The jury found them both guilty of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C.

4

§§ 841(a)(1)[3] and 846.[4]  The jury also found the brothers guilty of possession with intent to distribute the marijuana.  The court sentenced Willie to 262 months of imprisonment and Luis to 121 months.

II

A

Willie first challenges his conviction based on <u>Bruton v. United States</u>, 391 U.S. 123 (1968) (holding that a defendant's Sixth Amendment Confrontation Clause rights are violated when a court admits into evidence an incriminating statement given by a non-testifying co-defendant).  Before the trial began, the prosecution announced its intent to introduce a written statement given by Luis Reveles.  The statement incriminated Willie insofar as Luis stated, "I think Willie knew that there was drugs in the

---

[3]    (a)  Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally–

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

21 U.S.C. § 841(a)(1) (West 1981).

[4]    Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846 (West Supp. 1999).

5

boxes that I shipped for him." The government offered to introduce a redacted version of the statement, but Willie's lawyer said that the redaction was unnecessary and that he would not make any <u>Bruton</u> objection. After Willie's attorney said that he did not foresee a <u>Bruton</u> problem, the prosecuting attorney stated, "I want to make it clear in case he [Luis] changes his mind and doesn't testify --." Willie's attorney then interjected, "It's not that damaging." The judge then said that he would allow the statement to be admitted.

Now, however, Willie claims that admission of the statement constitutes plain error. If Willie had forfeited his right to make an objection based on his Sixth Amendment confrontation right,[5] the plain error standard of review would set the context for our analysis. But Willie did not forfeit his constitutional right. As the record reveals, and as Willie's attorney conceded to us at oral argument, he waived it. "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" <u>United States v. Olano</u>, 507 U.S. 725, 733 (1993) (citation omitted). When a defendant has waived a right, the district court cannot be said to have erred by failing to

---

[5]The Sixth Amendment states:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

U.S. CONST. amend. VI.

6

override the intentions of the defendant's counsel by asserting the right <u>sua sponte</u>. <u>Id</u>.[6] Because Willie explicitly waived his Sixth Amendment confrontation right at trial, he cannot successfully now claim that the district court erred by failing to protect that right.

B

Willie next argues that the government committed reversible error when at trial it questioned him about his silence during the investigation. At trial, Willie testified on his own behalf. In his testimony, he tried to convey to the jury that he had been willing to cooperate with the authorities during their investigation. Furthermore, on direct examination, Willie denied that he knew that the packages he shipped contained drugs and he testified that if he had known, he would have reported it to the

---

[6]<u>See also</u> <u>United States v. Stephans</u>, 609 F.2d 230, 232-33 (5th Cir. 1980) (holding that a defendant's attorney can waive the defendant's Sixth Amendment confrontation right "so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy"). Willie did not object to his attorney's decision. Although Willie now argues that the introduction of the statement harmed his case, he does not provide us with any argument as to why the waiver could not have been a "legitimate trial tactic or part of a prudent trial strategy." There are plausible reasons why Willie might not object to admission of the statement. For example, Willie testified that Luis had told him that the police coerced him into giving his statement. Willie could have decided, as a matter of strategy, that Luis's statement afforded him an opportunity to call into doubt the tactics used by the police. Whatever the possibilities, we will not speculate about the intentions of Willie's counsel when, on appeal, Willie has not called those intentions into question.

authorities.  Willie's attorney also questioned Willie about his response to the government's request for his cooperation.  Willie stated that he had attempted to meet with a government agent but that the agent "got upset and left" when Willie and his attorney were late for the meeting.

During cross-examination, the government made two comments, which Willie argues violated his Fifth Amendment right against self-incrimination.  First, the prosecutor asked Willie if he had gone to the police after Luis was arrested, but before his own arrest.  Second, the government brought out that Willie did not make any effort to cooperate with the authorities in the months after his arrest.  The district court sustained objections to both lines of questioning and the court gave a curative instruction to the jury.[7]  After discussing the curative instruction that would be given, the district court specifically asked Willie's counsel if he would like to request any other relief.  Willie's counsel declined the invitation.  Because it is not altogether clear whether we can stop our analysis here and decide whether the harmless error or

---

[7]The district court gave the following curative instruction:

Mr. Willie Reveles has been asked questions and has given answers about his cooperation with law enforcement officials after his arrest on the charges tried here.  I have decided whether or not Mr. Willie Reveles talked to law enforcement officials after his arrest is not relevant.  All testimony regarding issues of cooperation by Mr. Willie Reveles after arrest is, therefore, stricken, and you are instructed to disregard it.

8

plain error standard of review applies,[8] we will proceed to address the direct question of whether any <u>Doyle</u> violation occurred.

"In <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976), the Supreme Court held that the Due Process Clause . . . prohibits impeachment of a defendant's exculpatory story, told for the first time at trial, by using the defendant's post-arrest silence." <u>United States v. Rodriquez</u>, 43 F.3d 117, 121 (5th Cir. 1995). The <u>Doyle</u> rule "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" <u>Brecht</u>, 507 U.S. at 628 (citations omitted).[9] Thus, the prosecutor does not commit a constitutional error when he refers to the defendant's silence <u>before</u> the police have read the defendant his <u>Miranda</u> warnings. <u>Id.</u>; <u>see also</u> <u>Jenkins v. Anderson</u>, 447 U.S. 231 (1980). Therefore, Willie's argument concerning any of the government's references to his silence occurring before his arrest do not violate the Fifth Amendment as interpreted in <u>Doyle</u>.

Prosecutors may not, however, comment on a defendant's post-arrest silence as a method for impeaching the defendant's exculpatory defense. Nevertheless, <u>Doyle</u> does not prohibit

---

[8]<u>See</u> <u>Greer v. Miller</u>, 483 U.S. 756, 761 n.3 (1987) ("Before reaching the question whether the harmless-error standard applies, we must be satisfied that an error of constitutional dimension occurred.").

[9]Willie does not point to any portion of the record that indicates that he received <u>Miranda</u> warnings. We will assume that Willie was read the rights.

9

prosecutors from commenting on a defendant's post-arrest silence for all purposes.  The Court in Doyle gave one example of one such permissible purpose:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest.  In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.  Cf. United States v. Fairchild, 505 F.2d 1378, 1383 (CA5 1975).

Doyle, 426 U.S. at 619 n.11.  In Fairchild, which was cited with some approval by the Supreme Court, we held that a prosecutor may question a defendant about his post-arrest silence for the purpose of rebutting the impression that he cooperated with law enforcement authorities.  See Fairchild, 505 F.2d at 1383; see also Chapman v. United States, 547 F.2d 1240, 1243 n.6 (5th Cir. 1977) (stating that Fairchild "clearly survive[s] Doyle.").  A review of the trial transcript shows that the government's inquiries into Willie's post-arrest silence were for the purpose of rebutting his claim that he stood ready to cooperate all along.[10]  When a defendant attempts to convince a jury that he was of a cooperative spirit, Doyle does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation.  Therefore, the district court's curative instructions were unnecessary, and no constitutional violation occurred.

---

[10]See Record Vol. 7, pp. 859-61.

In his final argument, Willie urges that the district court erred as to the amount of drugs for which he was responsible.[11]  As described above, the district court judge determined that Willie involved himself in a conspiracy running from (at the latest) February 1995 through June 1996.  The government seized only three of the shipments made at the tail end of the conspiracy, but the district court assumed that every shipment (forty-two in total) Willie arranged during the relevant time period contained marijuana.  The Presentence Report, using evidence of each shipment's total weight, approximated the amount of marijuana by assuming that each shipment was the same weight percentage of marijuana as the average of those actually seized.  The district court specifically adopted the findings of the Presentence Report on this issue.  We review the district court's interpretation of the Sentencing Guidelines <u>de novo</u>; we review factual findings associated with the sentencing for clear error.  <u>See</u> <u>United States v. Carreon</u>, 11 F.3d 1225, 1230 (5th Cir. 1994).

Willie presents two arguments.  First, he argues that the district court failed to make the required findings, that is, when he joined the conspiracy, what drug quantities were within the

---

[11]"Under § 2D1.1(a)(3) of the Sentencing Guidelines, the offense level of a defendant convicted of a drug trafficking offense is determined by the quantity of drugs involved in the offense."  <u>United States v. Carreon</u>, 11 F.3d 1225, 1230 (5th Cir. 1994).

scope of the agreement, and what quantities the defendant could reasonably foresee being sold. Second, Willie argues that the evidence on which the court relied lacked any indicia of reliability for marijuana weight calculations.

Willie's first argument has no merit. The district court specifically adopted the findings of the Presentence Report as to which specific, documented deliveries should be counted in determining the amount of drugs attributable to Willie. Furthermore, Willie did not object to a lack of specificity at the sentencing hearing.

The district court's finding as to the amount of marijuana involved is a finding of fact, reviewed under the clearly erroneous standard. See United States v. Gaytan, 74 F.3d 545, 558 (5th Cir. 1996). "A factual finding is not clearly erroneous as long as the finding is plausible in the light of the record as a whole." United States v. Brown, 7 F.3d 1155, 1159 (5th Cir. 1993). The preponderance of the evidence standard is the applicable standard of proof for sentencing purposes. See Gaytan, 74 F.3d at 558.

The district court's determination that all of the shipments contained marijuana was not clearly erroneous. Evidence at trial showed that Willie made his initial contact with drug suppliers before February 1995. The documented shipments sent after this date were packaged in a similar fashion; the same few shipping companies were used for delivery; and all of the shipments were addressed to non-existent companies. Furthermore, Willie offered

12

no credible evidence showing that the boxes contained anything other than drugs.

The district court relied, to some degree, on a First Circuit case that upheld a district court's decision to include the contents of known-but-not-seized mailings in the sentencing calculation. See United States v. Sklar, 920 F.2d 107 (1st Cir. 1990). Because the mailings were delivered in the same fashion and had other similarities with the known illegal mailings, the court upheld the district court's inclusion of them. In the instant case, we simply hold that the shipments, and the circumstances surrounding them, bore sufficient indicia of similarity to seized shipments of marijuana so that the district court did not clearly err in finding, under the preponderance of the evidence standard, that all of the shipments contained marijuana.

## III

We next consider Luis's challenge to the sufficiency of the evidence for his conviction. To succeed in its case against Luis, the government must have proved beyond a reasonable doubt that Luis knowingly possessed a controlled substance and that he knew of the conspiracy. See, e.g., United States v. Villegas-Rodriquez, 171 F.3d 224, 228 (5th Cir. 1999) (discussing elements).[12] Luis

---

[12]The district court also gave a "deliberate ignorance" instruction to the jury. Luis does not challenge this instruction on appeal. We note, however, that the instruction does not lessen the government's burden to show, beyond a reasonable doubt, that the knowledge elements of the crimes have been satisfied. As we have recently reiterated, "[a] deliberate ignorance charge is

13

challenges only the knowledge element of the conspiracy and possession with intent to distribute charges, arguing that the government failed to prove beyond a reasonable doubt that he knew the shipments contained marijuana. We agree.

In reviewing the evidence, our task is to "determine whether a reasonable trier of fact could have found that the evidence established the essential elements of the crime beyond a reasonable doubt." United States v. Ortega Reyna, 148 F.3d 540, 543 (5th Cir. 1998). We view all of the inferences that may be drawn from it in the light most favorable to the verdict. Id. "Our role does not extend to weighing the evidence or assessing the credibility of witnesses." United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996). Furthermore,

> [t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. If the evidence, however, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances "a reasonable jury must necessarily entertain a reasonable doubt."

Id. (citations omitted; emphasis in original).

With the scope of our review firmly planted in our mind, we must nevertheless conclude that a reasonable trier of fact would

---

intended 'to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge.'" United States v. Threadgill, 172 F.3d 357, 368 (5th Cir. 1999)(quoting United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990)).

see virtually equal circumstantial evidence of incrimination and exoneration, and consequently would entertain a reasonable doubt whether Luis actually had specific knowledge that he was shipping drugs for his brother. When the evidence is in equipoise, as a matter of law it cannot serve as the basis of a finding of knowledge. See Ortega Reyna, 148 F.3d at 545. Several pieces of evidence are especially compelling. First, it is uncontroverted evidence that Luis left his name, address, and phone number on an unattended shipment containing hundreds of pounds of marijuana. Second, the shipments bore no outward indication that they contained marijuana, i.e., they had no odor and the packaging suggested nothing untoward; indeed, the shipments were packaged in industrial cellophane so as to discourage any investigation into their contents.[13] Third, Luis did not attempt to avoid the presence of several customs officials and accompanying drug-detecting canines. Fourth, the government presented no convincing evidence that Luis knew his brother was involved in narcotics. Fifth, Luis provided the police with a full statement--the facts of which the government has never contested--of his involvement with his

---

[13]This fact contrasts with cases in which outward appearances put the defendant on notice that he might be carrying drugs. See, e.g., Lara-Velasquez, 919 F.2d at 953 (inside of camper shell in which the drugs were hidden was inexplicably painted two shades of white and noticeably patched on the underside); United States v. Restrepo-Granda, 575 F.2d 524, 529 (5th Cir. 1978) (suitcase given defendant by stranger, and packed by stranger, contained hangers so oversized so as to contain approximately four and one-half pounds of cocaine).

brother's business. Finally, Willie paid Luis only fifty dollars per delivery, a sum lacking in disproportion to the task at hand by which Luis might have become suspicious of the true nature of his assignment.[14]

The government argues that five circumstances support a guilty beyond a reasonable doubt conclusion. We will review each of those circumstances.

First, the government notes that Luis Gil's testimony recounted a conversation he had with Willie in which Willie mentioned his brother, Luis.[15] Luis Gil testified that "Willie stated he got real busy and he couldn't handle it by himself so he had to get his brother involved." This was the only reference to Luis Reveles--whom Luis Gil did not know by name or sight--in Luis Gil's testimony. The statement indicates nothing about Luis Reveles's knowledge of the drugs. Getting Luis "involved" does not necessarily imply informing Luis of the nature of the business,

---

[14]Fifty dollars per delivery contrasts sharply to cases in which the defendant protested lack of knowledge of his shipment's contents despite having been paid a substantial sum of money to accomplish a relatively routine task. See, e.g., United States v. de Luna, 815 F.2d 301, 302 (5th Cir. 1987) (defendant offered $10,000 to deliver a load of cabbage into the United States even though the job usually paid only $1000). Moreover, in contrast to Willie, the government presented no evidence to suggest that Luis possessed substantial, even discernible, assets, and certainly not any large sums secreted in foreign bank accounts as did Willie. Indeed, the uncontroverted evidence is that Luis was unemployed and living with his sister.

[15]Luis Gil operated as a shipping broker for narcotics suppliers. He would introduce drug dealers to people who could transport their drugs.

16

even though they were brothers.  As stated, the evidence showed that Willie did not get along with his family and was paying Luis only fifty dollars per trip.

Second, the government points out that the routine Luis followed (on three occasions) in picking up and delivering the shipments was suspicious.  Luis would meet three men at a restaurant, take their loaded vehicle to the shipping company, then return the vehicle to them at the restaurant.  This point is the government's strongest argument; this arrangement was indeed suspicious.  It is surely evidence that Luis knew he was being "used" for some undisclosed and probably illegal reason.[16]  A

---

[16]We agree with the government up to a point.  This arrangement was so bereft of any rational explanation that a reasonable juror could conclude beyond a reasonable doubt that Luis must have known that he was being used to further some illegal activity.  The government seems to argue that because the transaction occurred in El Paso, a known source city for narcotics, Luis knew his activities involved drugs.  Drug activity is not the only illegal activity occurring in El Paso.  We are therefore unwilling to say that a rational juror could find beyond a reasonable doubt that, based on this inference, Luis knew drugs were involved.  The indictment specifically charged conspiracy with intent to distribute marijuana and possession with intent to distribute marijuana, that is, it specifically charged knowledge of drugs.  The shipments, however, easily could have involved other contraband goods such as illegally-imported ceramics inasmuch as Willie was involved in that business.  No evidence suggests that Luis was ever told the shipments involved marijuana; indeed, there was direct testimony stating that Luis was not so informed.  "It is not enough for [the government] merely to establish a climate of activity that reeks of something foul."  United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982) (citation omitted).  See also United States v. Zapata, 497 F.2d 95, 99 (5th Cir. 1974).  Furthermore, that Willie paid Luis only fifty dollars per trip lends credence to Luis's position that he believed the shipments' contents involved a far less lucrative contraband.

reasonable jury could thus harbor a suspicion that Luis himself suspected narcotics might be involved. But this suspicion--even if focused on narcotics--is not enough; it does not tie him to knowledge that <u>drugs</u> were involved beyond a reasonable doubt. "[M]ere suspicion cannot support a verdict of guilty." <u>United States v. Sacerio</u>, 952 F.2d 860, 863 (5th Cir. 1992). Although the arrangement was suspicious, it is also important to note that Luis freely explained this routine in detail when he gave his voluntary statement after being arrested.[17] The government presented no evidence to suggest Luis's statement was not truthful.[18]

Next, the government points out that in his voluntary, post-arrest statement, Luis said, "I think Willie knew that there was drugs in the boxes that I shipped for him." The government argues that a reasonable jury could have read this statement to conclude that Luis could only know about Willie's knowledge because Luis himself knew of the drugs. Context is important. When the statement was given, Luis had just been told that he was being arrested for delivering a shipment of drugs to the carrier. Luis was explaining how he had come to deliver the package to the

---

[17]The statement was not a confession. Luis disclaimed any knowledge of the drugs, but explained fully to the authorities how he was involved in the deliveries.

[18]The truthfulness of Luis's statement differs from situations in which a defendant has initially lied to police upon questioning. <u>See, e.g.</u>, <u>Ortega Reyna</u>, 148 F.3d 544 n.16 (citing cases involving inconsistent statements provided to authorities); <u>Farfan-Carreon</u>, 935 F.2d 678, 681 (5th Cir. 1991); <u>Lara-Velasquez</u>, 919 F.2d at 953.

carrier for his brother, and was answering questions relating to his brother. The statement is a reflective one, made with the insight that accompanies hindsight. A fuller quotation of Luis's statement is warranted:

> My brother works at McNutt Inc. 3513 Rosa 532-4411 where they sell carpet, tile, and floor coverings. He has worked there for the past two to three years as a salesman. He once owned a business named DECOR located at 1121 Larry Mahan. My brother owns four cars, two Lincolns 1986 and 1993, a light grey 1990 Jaguar, and a 1986 GMC Cherokee. I believe the cars are paid. My brother is married to MARISELA REVELES who works for the Health Department located on Airway. I think Willie knew that there was drugs in the boxes that I shipped for him. My brother Willie is very proud of all of the money that he has. My brother has a drinking problem, and does not get along with the rest of our family.

This statement plausibly reads more like the statement of a unwitting and subsequently bitter mule--i.e., one reflecting, "Willie must have known"--rather than the statement of a co-conspirator. More importantly, the statement literally read does not provide any indication that Luis knew his brother was shipping marijuana.[19] Luis's statement says, "I think Willie knew." From this voluntary statement, a jury could not conclude that Luis knew of the drugs; a reasonable jury could only draw an inference that Luis knew of the drugs if Luis had stated the equivalent of "I know that Willie knew the shipments contained drugs."

---

[19]There is no indication that Luis knew Willie had been engaged in criminal activity, knowledge we have previously relied upon to uphold a finding of knowledge. See, e.g., Farfan-Carreon, 935 F.2d at 681; Lara-Velasquez, 919 F.2d at 953.

19

In its fourth item of circumstantial evidence, the government characterizes the evidence as indicating that Luis participated in the shipments on a routine basis, more than the three times the investigation actually revealed. But the testimony the government points to for support of its characterization does not lend much support at all.[20] The government notes that Ms. Torres, her daughter and one Dennis Owens (who all worked at SGT) identified both Luis and Willie as people associated with CC Enterprises (one of Willie's fictional entities). But their testimony does not indicate that they held this view because they had seen Luis deliver shipments on a frequent basis. The government never asked these witnesses to estimate the number of times they saw Luis deliver shipments for Willie. In fact, the government asked Dennis Owens whether he had accepted "few or many" shipments from Luis. Owens responded, "Few." If the government had presented evidence that Luis participated in a substantial number of the forty-two shipments, a jury might infer that this fact increased the likelihood of Luis's knowledge that drugs were involved. But as

---

[20]The dissent argues that Luis has attempted to minimize his involvement, and points to inconsistencies in Luis's statement to the police following his arrest. Based on the evidence presented at trial, a reasonable juror could believe that Luis made more than two or three deliveries for Willie. Luis's statement, however, does not contradict that inference. His statement literally reads that "[t]his year" (1996) Willie asked Luis to do "at least" three deliveries. While concrete evidence only supports a finding of two deliveries, Luis's statement is consistent with the other testimony presented at trial. The evidence, however, does not support a finding that Luis made deliveries on a regular basis.

the government actually presented its case, the jury only knew of Luis's involvement in, at most, three shipments. Any conclusion of further involvement would have been speculation.

The final piece of circumstantial evidence the government points to involves one of the deliveries Luis made. Luis met an SGT employee at the shipping company (Herman Miles Trucking). When Luis arrived, the SGT employee was talking to several Customs agents. These uniformed agents had several canines with them. After the SGT employee finished talking to these agents, he came over to process Luis's shipment. Luis then asked the SGT employee why he had been talking to the Customs agents. The worker told Luis that he had applied for a position to work as a canine officer. According to the employee's testimony, this response "shocked" Luis.

The government now argues that Luis's "shock" shows a rational fear of having a load of drugs in the vicinity of canine-wielding Customs agents. But read in context, the SGT employee's testimony indicates that Luis's "shock" was the result of being told that this employee had applied for a job as a canine officer.[21] The

_____

[21]The government cites the following exchange between the prosecutor and the SGT employee (Dennis Owens) as evidence of Luis's incriminating "shock":

Q. All right. And Willie Reveles' brother asked you--could you say it again, please?

A. He asked me if I know them [the customs officers] and what was I doing talking to them.

testimony does not indicate that the "shock" was a result of the Customs agent's presence.  If Luis did know about the drugs, it would have been inconsistent with guilty knowledge for him to continue processing the shipment with narcotics dogs in the area. (The agents and dogs had gone into the warehouse while Luis and the SGT employee were processing the freight out on the loading dock.) Indeed, the fact that Luis stayed, and continued to process the shipment, would cause some doubt in any reasonable juror's mind as to Luis's knowledge.

---

Q.  Did you reply to him?

A.  Yes, I told him--I said, 'Why, does it matter?'  And I told him what the reason was I was talking to them.

Q.  All right.  Did he say or ask anything else?

A.  No, he didn't.

Q.  Did you say or ask anything else?

A.  No, I didn't.

Q.  Did he seem--you said you told him why you were talking with the Customs officer.

A.  Right.

Q.  Did that have something to do with your application?

A.  Yes, it did.

Q.  Did he seem surprised you had sought employment with the Customs agency?

A.  Yes.  He seemed shocked.

At this point, the government passed the witness.

The jury had before it other conduct of Luis that seems exculpatory. After dropping off the third seized shipment, Luis left a note with his correct name, address, and phone number on the freight. Such conduct is irrational if one knows that this crate and the other crates he had shipped contained hundreds of pounds of drugs. Additionally, as we have mentioned earlier, Willie paid Luis only fifty dollars per shipment. This compensation does not raise an inference of the presence of drugs; if the compensation has any probative value at all, it tends to offset an inference of guilty knowledge of the shipments' contents. In sum, when all of the evidence in this case is considered, it "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." Lopez, 74 F.3d at 577.

What is essentially lacking in this case is any evidence that Luis knew his brother was in the drug business. Without that evidence, the other incriminating evidence is that of the ~~odd~~ suspicious arrangements made for Luis to pick up the shipments from a nearby restaurant before delivering them. Because the evidence is not subject to a clear interpretation beyond a reasonable doubt that Luis knew drugs were involved, and in view of the other evidence tending to show that he lacked guilty knowledge of drugs, this one piece of incriminating evidence is insufficient for a jury to conclude beyond a reasonable doubt that Luis knew of the drugs.[22]

_____

[22]We note that the dissent's conclusion of "overwhelming suspicious" circumstances in this case rests on facts that do not

23

We understand our role as a narrow one in reviewing the jury's verdict. Nevertheless, we are not to ask whether Luis could have been guilty, but instead whether a reasonable jury could find no reasonable doubt as to Luis's guilt. In this case, a reasonable jury could not have rid itself of a reasonable doubt that Luis may not have known of the drugs based on the government's case. For this reason, we REVERSE Luis's convictions.[23] As we have said earlier, the convictions and sentence of Willie Reveles are AFFIRMED.

AFFIRMED in part; REVERSED in part.

---

rise to those existing in cases such as United States v. Cano-Guel, 167 F.3d 900 (5th Cir. 1999); Ortega Reyna, supra, Farfan-Carreon, supra, Restrepo-Granda, supra, Luna-Velasquez, supra, or de Luna, supra.

[23]Because we reverse Luis's convictions, we will not address his challenges to his sentencing.