United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 29, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 05-40936

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARNOLD ANTHONY MIRELES,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

Before JONES, Chief Judge, and DAVIS and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Arnold Anthony Mireles ("Mireles"), federal prisoner # 41294-179, appeals his conviction and

sentence on two counts of possession with intent to distribute more than 50 kilograms of marijuana

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c). Mireles argues that: (1) there was insufficient

evidence to support his conviction; (2) the provisions of 21 U.S.C. §§ 841(a) and (b) are facially

unconstitutional under the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (3) the special

condition of his supervised release in the district court's written judgment impermissibly conflicts with

the condition contained in the oral pronouncement of his sentence.

I.

In 2004, Mireles lived in Falfurrias, Texas and drove a tow truck for his father's business, Arnold's Wrecker Service ("Arnold's"). Brooks County is in close proximity to the United States Border Patrol Checkpoint on Highway 281 near Falfurrias ("Falfurrias Checkpoint"). The Brooks County Sheriff's Office (BCSO) is responsible for responding to calls for assistance from the local community. If a caller needs a wrecker service, a BCSO dispatcher will dispatch a county-contracted wrecker services, of which Arnold's is one. The primary wrecker service rotated every week to spread the work among the contracted services. Mireles frequently retrieved abandoned or seized vehicles along Highway 281, often passing through the Falfurrias Checkpoint. Mireles was also friends with BCSO Deputy Sheriff Homer Morales, Jr. and often rode on patrol with Morales.

On August 28, 2004, at 3:22 p.m, Mireles called BCSO and informed Cavazos that "a guy" would soon call and report a broken-down vehicle. Mireles testified that a man had called him to tow a pickup truck located at Delicia's Restaurant, south of the Falfurrias Checkpoint. Mireles told Cavazos that he had already spoken to this person and instructed him to call BCSO before Mireles would agree to pick up the vehicle. Mireles testified that he often routed private calls through the BCSO to ensure that the call was legitimate. Cavazos testified that the call was unusual but that wreckers sometimes routed their private calls through the BCSO. Mireles instructed Cavazos to call Mireles back when "the guy" called.

Several minutes later, Cavazos received a telephone call from a person requesting a wrecker. The person said that he had already called Mireles and had been instructed to call BCSO first. The caller specifically wanted Arnold's and provided Cavazos with Mireles's correct cellular telephone

number. The caller did not provide Cavazos with a name, telephone number, or any identifying information, nor did he tell Cavazos the make or location of the vehicle. Cavazos then called Mireles back and told him "[t]hat guy called me."

Because Mireles had his arm in a sling from an automobile accident, he had his friend, Juan Ochoa, go with him to help pick up the vehicle. Mireles testified that when they arrived at Delicia's Restaurant, the only vehicle there was a red extended Chevrolet pickup truck parked by the side of the road. Mireles did not inquire from anyone whether the red truck was the vehicle to be towed. Mireles testified that the keys to the vehicle were inside it. Ochoa hooked the pickup to the tow truck and the two headed back north to Falfurrias.

Border Patrol Agent Beatriz Alaniz-Hinojosa was working the primary inspection lane at the Falfurrias Checkpoint when Mireles arrived, driving the tow truck and towing the red pickup. Agent Alaniz-Hinojosa testified that Mireles told her that he had retrieved the vehicle from Delicia's Restaurant and was transporting it north of the Checkpoint. Agent Alaniz-Hinojosa testified that Mireles told her that Cavazos had called him and dispatched him to get the broken-down pickup. Agent John Harmon was present at the time and his trained canine alerted to the towed pickup. When asked for the keys to the pickup truck, Mireles gave them to Agent Harmon.

Upon searching the pickup truck, Agent Harmon discovered 49 bundles of marijuana, weighing 112 pounds, wrapped in duct tape. The bundles of marijuana were concealed inside and behind the seats and interior side panels of the truck and were not readily visible to someone looking inside the vehicle. Mireles and Ochoa did not display any of the usual indicators of nervousness that border patrol agents look for in assessing suspicious behavior.

Neither Mireles or Ochoa were arrested at that time because, according to Agent Diaz, there

-3-

was no evidence or suspicion that either of them had any knowledge that the marijuana was in the truck. After Mireles and Ochoa were released, Agent Diaz contacted BCSO to verify Mireles's explanation. At that time, he learned that Mireles had not actually been officially dispatched to tow a broken-down vehicle. Agent Diaz also discovered that the pickup truck was not actually broken down.

On October 8, 2004, an unknown person called BCSO and told Cavazos that his white Grand Marquis car was broken down at the Shell Station in Encino, Texas and needed to be towed. Encino is south of the Falfurrias Checkpoint. As Arnold's was on rotation at the time, Cavazos dispatched Mireles to pick up the vehicle. A video tape from the Shell Station in Encino shows that Mireles was already at or near the Shell Station at the time the initial call for a wrecker was received by Cavazos.

Mireles arrived at the Falfurrias Checkpoint driving the Arnold's wrecker and towing a 1989 white Grand Marquis. Border Patrol Agent Oscar De La Garza was working the primary inspection lane. Agent De La Garza testified that Mireles told him that the Grand Marquis was from a "bail out",[1] that someone from BCSO had called him to pick it up, and that he was taking it to BCSO to drop it off. This was suspicious because border patrol agents usually hear about bail outs immediately and Agent De La Garza was unaware of one. Agent Harmon was also present and his canine alerted to the rear part of the towed vehicle. The trunk was locked and Mireles claimed to not have the keys. The agents asked Mireles if they could open the trunk with a crowbar and Mireles simply stated that he did not want to be responsible for any damage to the vehicle. As the agents attempted to open the trunk, Agent Harmon noticed that Mireles had started to pace nervously. Mireles then

---

[1]A bail out occurs when illegal aliens abandon a vehicle in order to escape the pursuit of border patrol agents.

-4-

stated that he had another call to go on and offered to leave the Grand Marquis and return for it later.

Once the trunk was opened, the agents found wrapped bundles of marijuana, weighing 152 pounds, hidden in a spare tire and empty speaker box. At that time, Mireles was escorted inside the checkpoint station to Agent Diaz. After reading him his *Miranda* rights, Agent Diaz informed Mireles that his August 28th story had not checked out. Mireles became visibly nervous. At that time, Mireles changed his story and told Agent Diaz that the Grand Marquis was a broken-down vehicle, rather than a bail out, and that he was taking the vehicle to his own lot, rather than the BCSO impound lot. Mireles was then arrested.

Officer Griselda Pendleton, working for the DEA, later searched Mireles's wrecker and discovered the keys to the Grand Marquis hidden in a storage compartment under the seat. Officer Pendleton also discovered a piece of paper on it with the license plate number, make, year, and other information about the Grand Marquis in the wrecker. Finally, Officer Pendleton discovered that the Grand Marquis was not actually broken-down but merely had its battery cables unhooked.

At trial, a jury found Mireles guilty of two counts of possession with intent to distribute more than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c) for the August 28th and October 8th stops. The district court sentenced Mireles to 60 months incarceration for the first count and 78 months for the second, to be served concurrently, followed by concurrent three-year terms of supervised release. Out of concern that Mireles would resume commercial truck driving upon his release, the court imposed a "commercial activities on highways" special condition that requires Mireles, when stopped on the highway, to inform authorities that he is on supervised release for drug trafficking and consent to search of his vehicle and person. Mireles appealed.

II.

Mireles first challenges the sufficiency of the evidence to support his conviction on each count of possession with intent to distribute marijuana. Mireles only argues that the government failed to prove that he knew that he was transporting drugs, rather than some other form of contraband. As such, all other arguments challenging the sufficiency of the evidence are waived. *See Askanase v. Fatjo*, 130 F.3d 657, 668 (5th Cir. 1997).

When reviewing the sufficiency of the evidence to support a conviction, we "view the evidence in the light most favorable to the verdict and determine whether a rational jury could have found the elements of the offense beyond a reasonable doubt." *United States v. Gutierrez-Farias*, 294 F.3d 657, 660 (5th Cir. 2002). We recognize that the jury was "free to choose among all reasonable constructions of the evidence," *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992), and we "accept all credibility choices that tend to support the jury's verdict." *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991). "If the evidence, however, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction, as under these circumstances 'a reasonably jury *must necessarily entertain* a reasonable doubt." *United States v. Reveles*, 190 F.3d 678, 686 (5th Cir. 1999) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

In order to convict Mireles of possession with intent to distribute marijuana, the government had the burden of proving three elements at trial: (1) knowing (2) possession of marijuana (3) with intent to distribute it. On appeal, Mireles challenges only the knowledge element of the offense. As a general rule, a jury may infer knowledge of the presence of drugs from the exercise of control of a vehicle containing such contraband. *See United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir.

1995). When drugs are hidden from view in compartments, however, "this Court has normally required additional `circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" *Id.* (quoting *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1236 (5th Cir. 1990)). This requirement stems from the recognition that, in hidden compartment cases, there "is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise." *United States v. Diaz-Carreon*, 915 F.2d 951, 954 (5th Cir. 1990). This assumption is heightened when, as here, the vehicle was only in the possession of the defendant for a short time. *United States v. Ortega Reyna*, 148 F.3d 540, 544 (5th Cir. 1998).

On appeal, Mireles does not argue that the evidence was insufficient to demonstrate that he was knowingly transporting some sort of illegal contraband in the two towed vehicles. Instead, Mireles contends that the government failed to prove beyond a reasonable doubt that Mireles knew he was transporting drugs. To prove possession with intent to distribute marijuana, it must be shown that the defendant had knowledge that he was transporting drugs, rather than another form of contraband. *See Reveles*, 190 F.3d at 687-88 n. 16 (5th Cir. 1999) (finding that even though evidence showed defendant knew he was transporting something illegal, knowledge of drugs not shown when shipments could have easily involved other contraband goods); *see also United States v. Cartwright*, 359 F.3d 281, 286 (3d Cir. 2004). In the instant case, the district court expressly instructed the jury that to be found guilty, Mireles had to know that he was trafficking in drugs. Therefore, the guilty verdict presumably reflects a determination by the jury that Mireles knew he was trafficking drugs.

In support of his argument, Mireles contends that the government introduced no evidence that

Mireles had any prior involvement in drug trafficking, or that he knew or associated with individuals involved in drug trafficking. Further, Mireles argues that there is no evidence that the routes driven, times traveled, or locations involved were notorious for drug trafficking. Moreover, no evidence was presented that showed that Mireles had ever seen or touched the bundles of marijuana or the compartments that hid them in the two towed vehicles.

However, contrary to at least one of Mireles's contentions, the record does contain evidence that the Falfurrias Checkpoint is known for drug trafficking and smuggling of illegal aliens. Specifically, the Falfurrias border patrol agents testified that they frequently stopped vehicles transporting drugs and illegal aliens. Mireles himself had passed through the Falfurrias Checkpoint many times and was aware that vehicles were regularly stopped there for drug trafficking. Further, Mireles testified that he rode along on patrol with BCSO Deputy Sheriff Morales. Consequently, the jury could have reasonably inferred he was familiar with the common criminal activity of the area, namely drug trafficking and illegal alien smuggling.

In cases finding insufficient evidence of knowledge of drugs, rather than other contraband, courts have relied on the fact that, given the facts of the particular case, the defendant could have easily been smuggling another type of contraband. *See, e.g., Reveles*, 190 F.3d at 687-88 n. 16 (finding that, because man giving defendant packages was involved in shipping ceramics, shipments "easily could have involved" illegally-imported ceramics rather than drugs); *Cartwright*, 359 F.3d at 287 (finding that, because defendant was standing lookout in a shopping mall, contraband in shopping bag could easily have been stolen jewels, computer chips, currency, or other goods). Given the fact that Mireles was towing vehicles across the Falfurrias Checkpoint, he could only have reasonably thought he was smuggling either drugs or illegal aliens. However, on the August 28th stop, Mireles

-8-

was towing a flat-bed pickup truck. The photographs in evidence show that the pickup truck did not appear to have a trunk or other compartment in which an illegal alien could have been hidden. As such, the jury could have reasonably inferred that Mireles knew that the vehicle towed on August 28th contained illegal drugs, rather than some other type of contraband.

Further, Mireles was present during the August 28th stop when the border patrol agents removed the marijuana from the pickup truck. He nevertheless again attempted to smuggle contraband across the Falfurrias Checkpoint on October 8th in a manner similar to the first incident. This removes any reasonable doubt that Mireles believed he was transporting some illegal contraband other than drugs on October 8th. The fact that Mireles committed these two offenses in similar ways within two months of each other clearly supports a reasonable inference that he knew he was trafficking drugs. As such, there was sufficient evidence to support the jury's determination that Mireles knowingly possessed the marijuana in question. *Resio-Trejo*, 45 F.3d at 911.

### III.

Mireles also contends that the provisions of 21 U.S.C. §§ 841(a) and (b) are facially unconstitutional under the rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to the extent that they rely on drug quantity and type, facts not found by a jury, to increase a sentence within the statutory range. As Mireles concedes, this argument is foreclosed by our holding in *United States v. Slaughter*, 238 F.3d 580, 582 (5th Cir. 2000), *cert. denied*, 532 U.S. 1045, 121 S. Ct. 2015, 149 L. Ed. 2d 1015 (2001). Therefore, the argument fails.

### IV.

Finally, Mireles argues that the "truck driving" special condition of his supervised release in the district court's written judgment must be amended because it impermissibly conflicts with the

"commercial activities on highway" special condition contained in the oral pronouncement of his sentence.

Because Mireles "had no opportunity to object to or comment on the special condition[ ] . . . imposed in the written order," we "review the district court's imposition of [the] special condition[ ] for an abuse of discretion." *United States v. Warden*, 291 F.3d 363, 365 n. 1 (5th Cir. 2002).

Where there is an actual conflict between the district court's oral pronouncement of sentence and the written judgment, the oral pronouncement controls. *United States v. Wheeler*, 322 F.3d 823, 828 (5th Cir. 2003); *United States v. Moreci*, 283 F.3d 293, 299-300 (5th Cir. 2002); *United States v. Martinez*, 250 F.3d 941, 942 (5th Cir. 2001). The key determination is whether the discrepancy between the oral pronouncement and the written judgment is a conflict or merely an ambiguity that can be resolved by reviewing the rest of the record. *United States v. Torres-Aguilar*, 352 F.3d 934, 935-36 (5th Cir. 2003). If the written judgment broadens the restrictions or requirements of supervised release from an oral pronouncement, a conflict exists. *See Wheeler*, 322 F.3d at 828 (finding conflict where oral pronouncement required defendant to perform 120 hours of community service within the first year of supervised release while written judgment required 125 hours within two years); *Moreci*, 283 F.3d at 299-300 (finding conflict where two-year difference in term of supervised release between written judgment and oral pronouncement). If a conflict exists, the appropriate remedy is remand to the district court to amend the written judgment to conform to the oral sentence. *Wheeler*, 322 F.3d at 828 (citing *Martinez*, 250 F.3d at 942).

During sentencing, the district court orally pronounced a special condition of Mireles's supervised release that:

in the event that you are stopped on the highway while you're engaged in commercial

-10-

activities as a truck driver or as a wrecker driver, you will advise the authorities that your are on Supervised Release for drug trafficking and that they may search your car and your person.

However, in the written judgment, the district court defined this special condition as:

TRUCK DRIVING CONDITION: While on supervised release and engaged in truck driving either as the driver or a passenger, the defendant shall, upon arriving at a checkpoint, border crossing, weigh station, or upon being stopped for an environmental or safety inspection, or traffic violation, or upon any road side contact, declare to the officer that the defendant is on supervision for a drug related offense. Upon request, the defendant shall consent to a search of the tractor, trailer, its contents and his person.

Mireles contends that the written judgment conflicts with the oral pronouncement of the special condition, broadening its requirements in several respects. Mireles argues that, in the oral pronouncement, the special condition only applies to Mireles: (1) while he is engaged in commercial truck driving; (2) as a driver; and (3) when he is driving on the highway. Mireles contends that the special condition in the written judgment applies to Mireles both: (1) while he is engaged in commercial and non-commercial truck driving; (2) as a passenger and as a driver; and (3) when he is driving on and off the highway.

The special condition contained in the oral pronouncement clearly only applies to Mireles's commercial truck driving activities. Mireles argues that because the written judgment does not contain the "engaged in commercial activities" language found in the oral pronouncement, the special condition in the written judgment authorizes a search when law enforcement comes into contact with Mireles while he is truck driving in a non-commercial capacity. Although the term "truck driving" in the written judgment is ambiguous in isolation, when considered in the context of the entire record it is clearly meant to only encompass commercial truck driving. The language of the oral pronouncement illustrates that the district court included the "commercial activities on highways"

exception because it was "entirely possible [Mireles] might be engaged in truck driving or go back into this business." The district court thus sought to prevent Mireles from again using his commercial truck driving activities as cover for drug trafficking. Nothing in the record suggests that the court was at all concerned with regulating Mireles's non-commercial activities. Therefore, the term "truck driving" in the written judgment only covers commercial activity. The written judgment, then, does not conflict with the oral pronouncement of the special condition in this regard.

Mireles next argues that although the special condition in the oral pronouncement only applies when Mireles is a "truck driver" or a "wrecker driver," the condition in written judgment applies when Mireles is either a "driver or a passenger. Although the term "passenger" is not present in the oral pronouncement, we find that this discrepancy is merely an ambiguity that can be resolved by looking to the intent of the district court. As noted above, it is clear from the record of the oral pronouncement that the district court sought to prevent Mireles from trafficking drugs while engaged in commercial truck driving activities. It is not uncommon in commercial truck driving for two drivers to be used to spell each other. Therefore, when read in light of its purpose, the special condition in the oral pronouncement also applies to Mireles both as a driver and as a passenger.

Finally, Mireles contends that the written judgment broadens the special condition for supervised release because it does not restrict the reporting and consent to search requirements to highway truck driving. Although the oral pronouncement refers to it as the "commercial activities on highways" condition, the language should not be construed as narrowly as Mireles suggests. By necessity, a truck engaged in commercial activity must also travel on other streets to reach a highway. To give effect to the district court's intent, the condition in the oral pronouncement must be read to encompass this off-highway driving as well. Therefore, we find that the oral and written

-12-

pronouncements are also reconcilable in this respect.

V.

For the foregoing reasons, we AFFIRM.