United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 21, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 06-40961

———————————————

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

STEVEN LADALE THOMPSON, also known as Rock,

                              Defendant-Appellant.

--------------------
Appeal from the United States District Court
for the Eastern District of Texas
--------------------

Before KING, WIENER, and OWEN, Circuit Judges.

WIENER, Circuit Judge:

    Defendant-Appellant Steven Ladale Thompson was convicted by a jury of knowingly possessing with the intent to distribute more than five grams of cocaine base. Thompson contends on appeal that (1) statements made by the prosecutor during closing argument were so prejudicial that they denied him a fair trial, and (2) the district court's allowing the jury to view a videotape of a drug transaction in which Thompson allegedly participated was error because it was played to the jury without the accompanying audio portion albeit with a written transcript of the underlying audio recording scrolling along on the screen simultaneously with the video portion. We affirm.

## I. FACTS & PROCEEDINGS

In January 2003, Sergeant Keith Deramus, a narcotics investigator for the Texas Department of Public Safety, met with a confidential informant (the "CI") who had offered to help the local police with narcotics investigations in exchange for leniency on several charges he faced. The CI informed Deramus that an individual nicknamed Rock was selling crack cocaine in Daingerfield, Texas. Later, through local law enforcement officials, Deramus learned of Thompson and his use of the nickname Rock. Deramus obtained a photograph of Thompson and showed it to the CI, who identified the photo's subject as the person selling crack in Daingerfield under the street name of Rock. Deramus then arranged for the CI to purchase crack cocaine from that person.

In October 2003, the CI consummated three drug transactions with this person whom he knew as Rock. Deramus recorded the telephone conversations in which these two men arranged the transactions and, by using a voice transmitter secretly worn by the CI, recorded the transactions themselves. The CI later wore a hidden camera during the third transaction with Rock, which allowed Deramus to capture the images on videotape as well as the participants' voices.

Primarily based on the testimony of Deramus and the CI, as well as this recorded evidence, a federal grand jury returned a

three-count indictment charging Thompson with possessing with intent to distribute more than five grams of cocaine base. This led to Thompson's jury trial.

The only contested issue at trial was whether Thompson was the individual named Rock from whom the CI had purchased drugs in October 2003. The CI made a courtroom identification of Thompson as Rock and, after viewing the videotape of the third transaction along with the jury, made an in-court identification of Thompson as the person who sold him drugs on that and previous occasions. Superimposed on this video was a scrolling transcript, but the voice recording from which the transcript had been made was not audible.[1]

Deramus testified at trial that a person known to the CI only as Rock was one of the individuals whom the CI mentioned as a "target" during the CI's initial debriefing. Deramus also testified that he had not heard of Rock before the debriefing of

---

[1] The government contends that the video shown to the jury was a version of the VCR tape marked as Trial Exhibit 12b that was downloaded to a computer and projected onto a screen in the courtroom. The government insists that this downloaded version did contain audio. We are unable to verify this contention, but we have reviewed the VCR tape itself and confirmed that it contains no audio. We also note that the trial record includes transcriptions for all audio recordings played to the jury but does not include a transcription of the conversation taking place on the video. We will proceed, therefore, on the assumption that the jury never heard the audio portion of the video recording of the third transaction.

the CI, but "through research with the local authorities there in [the] Dangerfield Police Department, they informed me [that] they knew who this individual was." Deramus stated at trial that the local police gave him a photograph of a man whom they identified as Steven Thompson, the defendant, and whom they knew to go by the nickname Rock. Deramus then showed this photograph to the CI, who confirmed that the man in the photograph was the individual whom the CI had known only as Rock. The same photograph was entered into evidence at trial, and Deramus pointed out the defendant in open court as the person in the photograph.

Deramus also testified that after interviewing Thompson in March 2005, he (Deramus) again listened to the audio tapes of the transactions between the CI and Rock and recognized both recorded voices, one as that of the CI and the other as that of Thompson. Thus, in addition to the identification of Thompson by the CI, the jury heard Officer Deramus identify the defendant as the person in the photograph that the Dangerfield police had given to Deramus and had identified as the defendant, Thompson, aka Rock. The jury also heard Deramus identify that photograph as the one that he (Deramus) had shown to the CI, who had then confirmed to Deramus that the person in the photograph was the man known to the CI as Rock and named by the CI as a target in his initial debriefing by Deramus.

4

In addition, Joe Farino, the police chief of Daingerfield, Texas, testified that (1) he had served as the Daingerfield police chief for twelve years, (2) he knew almost everyone in town, but admittedly not every last member of the community,[2] (3) he knew Thompson, (4) he knew that Thompson's nickname was Rock, and (5) he did not know of anyone else in the community with the nickname Rock. The defense presented no witnesses.

In the government's closing argument, the prosecutor repeatedly punctuated his remarks to the jury with assertions that Thompson was the only person in Daingerfield, Texas nicknamed Rock. Thompson points to four such instances. First, the prosecutor began his closing argument by telling the jury that "there is only one Steven Thompson and only one individual known as Rock in Daingerfield, Texas, and that is the defendant." Later, the prosecutor showed the jury the photo of Thompson that Deramus had identified when it was entered into evidence and stated: "[T]his is Rock. And this is the only Steven Thompson in Daingerfield, Texas, and this is the only individual known as Rock in Daingerfield, Texas." Next, In summarizing the testimony of Chief Farino, the prosecutor told the jury that Farino "testified that there is only

_____

[2] According to one demographic data-collection website, the estimated population of Daingerfield, Texas in July 2005 was 2,470 (1,149 males and 1,368 females). See http://www.city-data.com/city/Daingerfield-Texas.html.

5

one Steven Thompson, who is also known as Rock in Daingerfield, Texas." Finally, after defense counsel's closing argument, in which he urged the jury to consider that Rock may have been someone other than Thompson, possibly someone from outside of Daingerfield, the prosecutor concluded his rebuttal by telling the jury that "there is only one Steven Thompson and only one individual named Rock in Daingerfield, Texas and that is the defendant right here."

After deliberating for three hours, the jury informed the court that it could not reach a unanimous decision. Over Thompson's objection, the court gave the jury a Modified Allen Charge from the Fifth Circuit Pattern Jury Instructions, and deliberations resumed. Thirty minutes later, the jury returned a verdict of guilty on all counts of the indictment.

## II.  ANALYSIS

**A.   The Prosecutor's Statements**

**1.    Standard of Review**

As Thompson failed to object timely to the prosecutor's comments, we review them for plain error.[3]

**2.    Applicable Law**

---

[3] United States v. Mares, 402 F.3d 511, 515 (5th Cir. 2005).

6

Even when a defendant timely objects to remarks made by a prosecutor in closing argument, the defense burden of establishing that such remarks denied the defendant a fair trial is substantial.[4] We accord "wide latitude to counsel during closing argument."[5] In so doing, we analyze closing argument in the context of the trial as a whole, recognizing that "[i]nappropriate prosecutorial comments, standing alone" will not justify reversal of a conviction obtained in an otherwise fair proceeding.[6] The determinative question in our inquiry is "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."[7] In answering this question, we consider "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction."[8]

### 3. Merits

---

[4] United States v. Guidry, 456 F.3d 493, 505 (5th Cir. 2006).

[5] United States v. Hernandez-Guevara, 162 F.3d 863, 874 (5th Cir. 1998).

[6] United States v. Young, 470 U.S. 1, 11 (1985).

[7] United States v. Virgen-Moreno, 265 F.3d 276, 290 (5th Cir. 2001).

[8] Guidry, 456 F.3d at 505 (quoting United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994)).

### a. Prejudicial Effect

Thompson contends that the magnitude of the unfair prejudice in this case was great, largely because the prosecutor's statements negated defense counsel's argument as to the one and only contested issue at trial —— whether the evidence proves beyond a reasonable doubt that Thompson was the person nicknamed Rock who sold drugs to the CI in October 2003. Thompson insists that the prosecutor's remarks (1) amounted to improper personal testimony, (2) were unsupported by the evidence, and (3) misstated witness testimony. Thompson emphasizes that the prosecutor repeated his improper remarks at the close of his rebuttal argument, knowing that defense counsel would have no further opportunity to address the jury.

The government counters that the prosecutor was simply asking the jury to draw reasonable inferences from the evidence presented to it. The government contends that the prosecutor's remarks had, at most, an insignificant prejudicial impact.

We are satisfied that the prosecutor's remarks were not actionably improper, much less so erroneous as to constitute plain error. We have long recognized that the proper function of the attorneys in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence" and not "to 'testify' as an

'expert witness.'"[9]  Nevertheless, "the assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence."[10]  It is permissible, therefore, for an attorney "to make statements that indicate his opinion or knowledge of the case . . . if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence."[11]  "Except to the extent he bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses."[12]

Here, there is no question but that the prosecutor voiced his opinion about the conclusions that the jury should reach based on the evidence, and engaged in a bit of oratory and hyperbole, as trial lawyers are want to do in closing arguments.  And, absent some evidentiary basis for those conclusions, his statements might have constituted improper prosecutorial "testimony."  In his closing argument, however, the prosecutor directly linked his assertions to the evidence presented at trial.  After the second of

_____

[9] United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978).

[10] Id.

[11] Id.

[12] United States v. Garza, 608 F.2d 659, 663 (5th Cir. 1979).

9

his allegedly prejudicial statements, the prosecutor told the jury: "Now you know that [that Thompson is Rock] <u>from the testimony that you heard here this morning</u>." He then recounted all of the evidence presented at trial, before again repeating his assertion that Thompson was the person nicknamed Rock who sold drugs to the CI. Similarly, the prosecutor ended his rebuttal argument by saying: "Ladies and Gentlemen, <u>you have all the evidence before you</u>, and I will tell you again there is only one Steven Thompson and one individual named Rock in Daingerfield, Texas . . . ."

The record makes clear that (1) the prosecutor's putatively improper statements were based on and linked to evidence presented during the trial, and (2) the evidentiary basis for those statements was obvious to the jury. Contrary to Thompson's contention, the fact that the prosecutor's remarks concerned the only issue contested at trial actually decreases its prejudicial impact. Having been presented evidence for the exclusive purpose of establishing Thompson's identity as Rock, the jury was not likely to mistake the prosecutor's statements for trustworthy conclusions based on his own knowledge or expertise, and was better prepared to recognize them for what they were, i.e., an obviously partisan prosecuting attorney's own opinions based on the same evidence that had been presented to the jury. Viewed from this

10

perspective, the prejudicial effect of the prosecutor's remarks was minimal at worst.

### b. Cautionary Instructions

On five separate occasions, the jury was informed that statements by attorneys were not to be treated as evidence: (1) during jury voir dire, (2) prior to opening statements, (3) prior to closing arguments, (4) during defense counsel's closing argument, and (5) in the written jury instructions. Thompson would have us rule that, because the prosecutor repeated his remarks so often and they concerned the sole contested issue at trial, these admonitions to the jury were insufficient to cure any prejudice. We disagree.

First, having been presented with evidence exclusively intended either to establish or to call into question Thompson's identity as Rock, the jury likely was keenly aware that (1) it must decide whether this fact was proved beyond a reasonable doubt, and (2) the prosecutor's remarks were part of his argument, and did not amount to testimony, much less unduly influential quasi-expert testimony. Second, the repeated instructions not to consider statements by attorneys as evidence must be assigned some curative effect. These instructions were given at each stage of trial and were repeated before, during, and — in writing — after the prosecutor's assertedly improper closing argument. Finally, the

11

prosecutor's remarks were expressed as conclusions to be drawn from the evidence presented at trial, and any prejudicial impact was negligible.    Consequently, we conclude that the cautionary instructions to the jury were more than sufficient to offset any unfair prejudicial effect of the prosecutor's remarks.

### c.    Strength of the Government's Case

In an effort to elevate the relative strength of the prosecutor's comments, the defense purports to identify numerous weaknesses in the government's case.  First, Thompson notes that the CI did not know the name Steven Thompson, and that Rock was the only name ever mentioned on any of the audio recordings in evidence.  He also points out that, on the videotape of the third transaction, the dealer's face is not recognizable.  Thompson further observes that Deramus's testimony about Thompson's voice matching that on the audio recordings was based on nothing more than a single, fifteen-minute conversation that Deramus had with Thompson in March 2005.  Thompson also catalogues numerous reasons why the CI's credibility could be questioned[13] and points to the lack of any corroborating evidence linking Thompson to the locations of the drug deals or the drugs themselves.  Finally,

---

[13] The CI had been, _inter_ _alia_, (1) paid for his services, (2) promised leniency in a felony prosecution in exchange for his cooperation in investigating Thompson,(3) later caught selling cocaine in Louisiana in violation of his cooperation agreement.

Thompson highlights the fact that the jury initially could not reach a decision and only returned a guilty verdict after receiving an Allen charge.

The government acknowledges that its case "was founded on the testimony of Sergeant Deramus and the CI," with the various recordings "corroborating" that testimony. We see Thompson's decision not to testify as rendering the government's audio evidence largely ineffectual to prove that the defendant and Rock are one and the same: The jury heard nothing from Thompson to compare to the voice on the audio recordings, and the video evidence appears to have been insufficiently clear to establish the drug dealer's identity, especially in light of the cosmetic changes that Thompson had made in his appearance before trial, e.g., shaving, getting a haircut, wearing a different style of clothes, etc. In addition, Deramus's testimony that he was satisfied, after a fifteen-minute conversation in 2005, that it was Thompson's voice on the low-quality audio recordings from 2003 is subject to question, as is the credibility of the CI. The jury's inability to reach a unanimous verdict until re-charged further supports Thompson's contention that the government's case was a weak one.

Nevertheless, as our earlier recitation of the evidence presented in this case makes clear, the testimony and the exhibits offered by the government were sufficient to connect all the dots

13

for the jury.  We are satisfied that, based on, inter alia, the testimony of not just the questionably credible CI, but also the very credible Deramus, and the photograph and other exhibits, the jury had an evidentiary basis to find that: (1) The defendant, Steven Thompson, also known by the Dangerfield police as Rock, was the same Steven Thompson whose photograph these local police had produced and given to Deramus after he told them that he was looking for a suspected drug dealer known on the street as Rock; and (2) Deramus then showed this photograph of Thompson to the CI who verified that the man in the photograph was the person known to the CI as Rock and previously named by the CI as one of the drug dealers to be targeted by Deramus.

We are satisfied that the prosecutor's comments in his closing argument were at most minimally prejudicial and that the jury was effectively instructed not to treat statements by the lawyers as evidence.  We hold, therefore, that the prosecutor's remarks complained of here do not "cast serious doubt on the correctness of the jury's verdict" and do not amount to plain error.

## B.  The Videotape Evidence

We have long recognized that "the use of tape recordings obviously is acceptable as long as a proper foundation has been laid and that recordings constitute real, as opposed to

14

testimonial, evidence."[14]  We have also recognized that "it is within the discretion of the trial court to allow a transcript to be used by the jury 'to assist the jury as it listens to the tape.'"[15]  This assistance will be necessary when "portions of a tape may be relatively inaudible" or "without the aid of a transcript, it may be difficult to identify the speakers."[16] Neither party directs us to any case — and we have found none — in which facts and circumstances like those presented in this case were implicated, i.e., a transcript-assisted video recording shown to the jury without contemporaneously playing the underlying audio recording represented in the transcript.

A supplemental transcript is intended only to aid the jury in its assessment of real evidence (the actual audio recording), so the omission of the underlying audio recording may constitute error.  The trial court apparently recognized this when it instructed the jury:

> I have admitted the transcript for the <u>limited</u> and <u>secondary</u> purpose of <u>aiding</u> you in <u>following</u> the content of the conversation <u>as you listen to the tape recording</u>, and also to aid you in identifying the speakers.

---

[14] <u>United States v. Onori</u>, 535 F.2d 938, 947 (5th Cir. 1976).

[15] <u>Id.</u> (quoting <u>United States v. McMillan</u>, 508 F.2d 101, 105 (8th Cir. 1974).

[16] <u>Id.</u>

15

You are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your <u>hearing of the tape recording itself</u> as the <u>primary evidence</u> of its own contents; and if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.[17]

Despite the government's insistence otherwise at oral argument, we do not believe that the audio portion of this filming was played to the jury, but neither do we find anything in the record reflecting that Thompson objected to the playing of the videotape and transcript without the contemporaneous playing of the audio portion. He now must show, therefore, that the district court committed plain error by allowing the video tapes to be entered into evidence and played with only a transcript and not the audio portion as well.[18]

To show plain error, Thompson must demonstrate that admitting the videotape and transcript without the underlying audio was error that was clear or obvious. The government emphasizes that, before trial, the parties had agreed to the use of a transcript that the defense had seen and that the transcript would appear on the video

---

[17] Emphasis added.

[18] <u>United States v. Thompson</u>, 454 F.3d 459, 464 (5th Cir. 2006).

screen and scroll along as the tape was played. Thompson does not challenge the accuracy or authenticity of the transcript, but challenges the failure of the government to play both the transcript and the underlying audio to the jury while it was viewing the video portion. Without the audio portion, Thompson contends, the jury was unable to evaluate the accuracy of the transcript or, more importantly, to compare the voices on the other recordings (and the CI's voice, which the jury heard at trial) to the voices of the individuals who appear on the videotape.

Even if the omission of the audio portion of the recording were unintentional (as it appears to have been), the district court should have recognized and corrected the mistake as soon as the video started to play. As it did not do so, we are constrained to treat the district court's failure to do so as clear or obvious error.

For this clear error to rise to the level of plain error, however, Thompson must also show that it affected his substantial rights. Thompson contends that it did because omission of the audio from the videotape bolstered both the CI's and Deramus's testimony that Thompson was the drug dealer depicted on the videotape. Thompson's contention on this point, however, depends on the supposition that hearing the voice of the dealer on the

17

videotape was somehow essential to the jury's determination of Thompson's identity and thus his guilt.  This defies logic.

First, as Thompson never spoke at trial, the voice on the videotape could not have provided a basis for the jury's own identification of Thompson as the drug dealer.  Second, the jury's inability to verify the accuracy of the transcript is immaterial, because Thompson neither challenges that nor disputes that the video shows a drug deal taking place.  Third, the fact that the jury could not compare the voice on the videotape to the voice on the other audio recordings is inconsequential.  The transcripts make clear that, in each audio recording (including the unplayed one underlying the transcript) the CI spoke with an individual named Rock.  The jury heard the audio recordings of the telephone conversations in which the CI and Rock agreed to meet for the third transaction, the one that was videotaped. Consequently, Thompson's contention that hearing the audio of the dealer's voice during the videotaped third transaction somehow could have altered the jury's perception of the evidence rests on the completely implausible assumption that the CI might have conducted the third transaction with an individual called Rock entirely different from the one with whom the CI spoke by phone when arranging the meeting earlier that day.

Given the totality of these observations, we conclude that Thompson's substantial rights were not affected by the omission of the underlying audio recording when the video and the transcript of the third transaction was shown to the jury. Consequently, the district court did not commit plain error when it allowed the jury to view that videotape and transcript in the absence of the audio portion of the recording.

### III.  CONCLUSION

The prosecutor's statements during closing argument did not deny Thompson a fair trial, and the district court's admission of the videotape recording of the third drug transaction with an accompanying transcript but without the underlying audio recording did not constitute plain error. Thompson's conviction and sentence are, in all respects,

AFFIRMED.

19