# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-50786

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

SANDRA LISSETH CEBALLOS,

Defendant–Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

June 16, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Defendant–Appellant Sandra Lisseth Ceballos appeals her conviction for transporting, attempting to transport, and engaging in a conspiracy to transport an alien within the United States for private financial gain. She alleges a violation of her Sixth Amendment right of confrontation, the erroneous admission of evidence necessary to prove the financial-gain element of the offenses charged, and cumulative error that deprived her of a fair trial. We affirm.

## I. BACKGROUND

On December 18, 2012, Customs and Border Protection (CBP) agents in El Paso discovered Abel Viera Mendez (Viera), a Mexican national, attempting

to enter the United States without authorization.[1] They detained Viera and, upon questioning, determined that he had entered the country by rappelling off of a bridge with the aid of a paid smuggler, "Chucky."

On learning that Viera had also arranged for transport within the United States, the agents set up a sting operation. With Viera's consent, one of the agents, Humberto Torres, posed as Viera and answered a call on Viera's cell phone from the suspected smuggler—a Spanish-speaking male—and requested a ride. Agent Torres gave the smuggler a meeting location, and the smuggler told Agent Torres that a gray, four-door Mitsubishi with tinted windows would pick him up. Once at the designated site, Agent Torres continued to pose as Viera while fellow agents Brendan McCarthy and Orlando Marrero–Rubio set up surveillance. Agent Torres also surreptitiously initiated a phone call with Agent McCarthy, enabling Agent McCarthy to hear Agent Torres's activity.[2]

Shortly after Agent Torres's conversation with the smuggler, Ceballos arrived at the location in a vehicle matching the smuggler's description. Ceballos, who was speaking on a cell phone, asked the person on the line, "What was his name?" She then asked Agent Torres whether he was "Abel." After Agent Torres replied in the affirmative and confirmed that Ceballos was aware of "Abel's" immigration status, Ceballos invited Agent Torres into the vehicle. At this time, Agent Torres dropped his cell phone, a coded signal to Agents McCarthy and Marrero–Rubio to apprehend Ceballos. The agents separately placed both Ceballos and Agent Torres, still posing as Viera, under arrest.

The agents issued Ceballos her *Miranda* warnings, and before invoking her right to counsel, Ceballos indicated that she had been at the location either

---

[1] We recount the facts as presented at Ceballos's trial, viewing them in the light most favorable to the verdict. *United States v. Ambriz*, 727 F.3d 378, 380 n.1 (5th Cir. 2013).

[2] Agent McCarthy also maintained visual contact with Agent Torres for much of the operation, and he confirmed key aspects of Agent Torres's testimony at trial.

to pick up her ex-husband José or to collect child support from him.[3] The agents then placed Ceballos in a CBP vehicle with Agent Torres, who continued to present himself as Viera. Agent Torres repeatedly asked Ceballos why she had called "the migra." Ceballos replied, "Who are you? I don't know you. Don't talk to me." Agent McCarthy testified that Agent Torres was not aware that Ceballos had been Mirandized before she joined him in the CBP vehicle, and Agent Torres confirmed that he was unable to hear Ceballos's conversation with the other agents; all agree that once Ceballos requested an attorney, no agent other than Agent Torres—still posing as Viera—questioned Ceballos.

Following Ceballos's arrest, the agents inventoried the contents of the vehicle and discovered two cell phones as well as a notebook in Ceballos's purse that contained dates, the names "Enrique" and "José," references to "girl[s]," "guy[s]," and a "couple," dollar amounts, and notations in Spanish and English signifying "pick up," "deliver," and "food." There were no entries in the notebook dated December 18, 2012, but there was one entry dated December 16, 2012. Agent Felix Amaya, who assisted his colleagues in processing Ceballos's arrest and handling her possessions, photocopied the pages of the notebook on the suspicion that it served as a ledger of Ceballos's smuggling activity. Another agent, Elias Contreras, searched Ceballos's cell-phone call history and noticed several calls to contacts named "Enrique" and "José ex" around the time of Ceballos's apprehension. In addition, Agent McCarthy interviewed Viera and obtained a sworn written statement describing the events of December 18 and detailing the arrangements he had made with "Chucky."

---

[3] Ceballos testified at trial that she had traveled to the location to pick up José, and because it was dark, she mistook Agent Torres for José. By Ceballos's account, Agent Torres approached her vehicle and initiated contact with her by saying, "Abel." This confused Ceballos and prompted her to repeat the name; at this point, she testified, Agent Torres dropped his phone and opened her car door, and the remaining CBP agents approached to arrest her.

No. 13-50786

Ceballos was indicted for (1) conspiracy to transport aliens within the United States for private financial gain and (2) transporting and attempting to transport an alien within the United States for private financial gain.[4] A jury found Ceballos guilty of both counts,[5] and Ceballos timely appealed.

## II. DISCUSSION

We have jurisdiction to review the district court's final judgment of conviction under 28 U.S.C. § 1291.

Ceballos raises three challenges to the evidence presented at her trial. First, she contends that the admission of Viera's testimony—both through Viera's sworn, written statement and through the testimony of CBP agents—violated her Sixth Amendment right of confrontation. Second, she avers that the notebook in her purse, which the Government alleged was a smuggling ledger, was inadequately authenticated and constituted inadmissible evidence of prior bad acts under Federal Rule of Evidence 404(b). Third, she claims cumulative error in inappropriate Government witness testimony, alleged pro-prosecution statements by the trial judge, and improper closing argument by the Government. We discuss each asserted error in turn.

## A.     The Confrontation Claim

Ceballos first argues that the district court violated her Sixth Amendment rights by admitting Viera's testimony into evidence without first establishing that he was unavailable and that Ceballos had a prior adequate opportunity to cross-examine him. As Ceballos failed to object to the testimony at trial, our review would ordinarily be for plain error. *United States v. Vasquez*, 766 F.3d 373, 378 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1453 (2015).

---

[4] The Government did not criminally prosecute Viera and did not attempt to identify Chucky, Enrique, or José, or to determine whether they had a role in the alleged smuggling conspiracy.

[5] Ceballos unsuccessfully moved for a directed verdict and for a judgment of acquittal or, in the alternative, a new trial.

4

No. 13-50786

However, because we conclude that Ceballos waived her right of confrontation through her counsel's unchallenged stipulation to the admission of the testimony, her claim is "entirely unreviewable," *United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995); *see United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (internal quotation marks omitted)).

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant to confront the witnesses against her. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Specifically, the Clause bars the introduction of testimonial evidence against a criminal defendant unless the proponent shows both that the declarant is unavailable and that the defendant had "a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Nevertheless, counsel in a criminal case may waive his client's Sixth Amendment right of confrontation by stipulating to the admission of evidence, "so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *United States v. Stephens*, 609 F.2d 230, 232–33 (5th Cir. 1980). The Government has the burden of proving that the defendant effected a valid waiver, and we "should indulge every reasonable presumption against waiver of fundamental constitutional rights." *United States v. Johnson*, 954 F.2d 1015, 1020 (5th Cir. 1992) (internal quotation marks omitted).

Prior to trial, the Government moved to have Viera, "a material witness," declared unavailable so that it would be able to introduce Viera's videotaped deposition into evidence at trial. At a pretrial conference, however, the Government withdrew its motion and also expressed its intention not to call Viera as a live witness. The Government explained that Viera's testimony "is

5

not essential to our case" but observed that defense counsel Fernando Chacon had intimated that he may make "an effort . . . to offer some or all of the videotaped deposition." Defense counsel made no remarks at this time.

The court then asked whether the parties had agreed on exhibits to be admitted. The Government stated that it had shared its eleven proposed exhibits with defense counsel and the court, and that "the defense doesn't have a problem with most of them, although they do oppose the ledger, which is Government's Exhibit Number 6." After a discussion of Ceballos's motion in limine to exclude the ledger, the court asked: "[A]s to everything else . . . you are in agreement as to the admissibility of the government's exhibits under those exhibit numbers?" Defense counsel responded affirmatively. The court then admitted all exhibits except Government's Exhibit 6 (the ledger) and Defendant's Exhibit 1 (Ceballos's cell phone records).

In response to a question from the court regarding "any major evidentiary issues" outstanding before trial, the Government advised the court that although defense counsel had raised no objection to several of the exhibits, Government's Exhibits 4, 5, 7, and 8 were "all documents from the . . . alien file" of Viera, "the material witness in this case." Exhibit 8 was Viera's sworn statement. Defense counsel explained that he had no objection to the admissibility of those exhibits, but he conditioned his agreement to admit the exhibits on the opportunity to cross-examine their proponents. The court expressed its understanding of defense counsel's position but made no indication that its ruling admitting the evidence had changed. Neither party identified any further issues for discussion.

During trial, the Government questioned Agent McCarthy regarding the subject matter of what Viera had told him following his apprehension. Additionally, at the Government's request, Agent McCarthy recited Viera's written statement. Although Ceballos did not object to either form of

testimony, she did cross-examine each of the CBP agents who served as a proponent of the stipulated evidence.

We hold that Ceballos effectively waived her right of confrontation. The record does not reflect, and Ceballos does not allege,[6] that she disagreed with her counsel's decision to stipulate to the admission of Viera's testimony. *See Stephens*, 609 F.2d at 232–33. Further, the stipulation was at least arguably "a legitimate trial tactic or part of a prudent trial strategy," *id.* As the Government points out, if Ceballos had opposed the admission of Viera's statements, the Government could have revived its motion to introduce Viera's videotaped deposition—a form of evidence that Ceballos's counsel may have viewed as uniquely harmful. Alternatively, Ceballos's counsel may have had strategic reasons to concede the admission of this particular evidence. Ceballos's counsel argued in closing that the Government had failed to carry its burden of proof, emphasizing that it "could have brought" witnesses like Viera but neglected to do so. And in view of Ceballos's defense that she was attempting to collect child support and was set up by her ex-husband in order to avoid his obligations, Ceballos's counsel may have viewed Viera's testimony—which did not implicate Ceballos or describe her vehicle—as exculpatory.[7]

We note that this case is distinct from *Stephens* in one important respect: the record before us does not reflect whether Ceballos *personally* assented to the stipulation. In *Stephens*, our foundational case on the waiver of the right of confrontation, the trial court questioned the defendants in detail about their

---

[6] Indeed, Ceballos has not filed a reply brief and so has not offered any rebuttal of the Government's waiver argument.

[7] Although Ceballos's counsel made no stipulation to the admission of *testimony* describing Viera's statements, this does not change the outcome of our analysis. As defense counsel's stipulation was unqualified except for the opportunity to cross-examine the proponent of the statement, and the testimony recounting Viera's statements to the CBP agents was entirely cumulative of Viera's written statement, we see no principled reason to exclude this testimony from the scope of the waiver.

understanding of the arrangement and its possible implications for their defense before it accepted the stipulation. 609 F.2d at 233. We placed notable emphasis on this fact: "Our reading of the record convinces us that both [defendants], with full knowledge of the implications, consented to the stipulation. There is no evidence that they expressed any reservations to their attorney prior to their appearance before the district judge." *Id.; see also United States v. Adams*, 439 F. App'x 340, 342 (5th Cir. 2011) (per curiam) (holding that defendant waived his confrontation right when he "was made aware of the issues surrounding the witness's availability" and "participated in his attorney's decision to admit [the witness's] written statement in lieu of her in-court testimony").

Here, by contrast, the district court never confirmed that Ceballos had assented to the stipulation—in fact, it is unclear whether Ceballos was even present for the pretrial conference. Further, as defense counsel made no contemporaneous confrontation objection at trial, the judge had no occasion to present Ceballos with the stipulation.

Nevertheless, we are not convinced that the facts of this case compel a different result. Indeed, this Court has found a valid waiver of the right of confrontation without evidence that the defendant *himself* expressed agreement with the stipulation. *See United States v. Reveles*, 190 F.3d 678, 683 (5th Cir. 1999), *abrogated on other grounds by United States v. Vargas–Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc). In *Reveles*, the government announced during a pretrial proceeding that it intended to introduce an incriminating written statement by a co-defendant. *Id.* The government offered to introduce a redacted version of the statement, but defense counsel replied that this was "unnecessary" and affirmed that "he would not make any *Bruton* objection." *Id.* When the government attempted to clarify the agreement for the record—"I want to make it clear in case [the declarant] changes his mind and doesn't testify," government counsel said—defense counsel interjected,

8

"It's not that damaging." *Id.* The judge then admitted the statement. *Id.* On appeal, the defendant "argue[d] that the introduction of the statement harmed his case." *Id.* at 683 n.6.

We rejected this contention and held that the defendant had effectively waived his right of confrontation, precluding even plain-error review of the evidentiary ruling. *Id.* at 683 & n.6. In addition to counsel's concession of waiver at oral argument, we noted that the defendant "did not object to his attorney's decision" at trial, "he d[id] not provide [this Court] with any argument as to why the waiver could not have been a 'legitimate trial tactic or part of a prudent trial strategy,'" and he did not "call[] [his attorney's] intentions into question" on appeal. *Id.* at 683 n.6. We concluded: "When a defendant has waived a right, the district court cannot be said to have erred by failing to override *the intentions of the defendant's counsel* by asserting the right *sua sponte*." *Id.* at 683 (emphasis added) (citing *Olano*, 507 U.S. at 733).

Our reasoning in *Reveles* suggests that a permissible waiver of the right of confrontation is not contingent on evidence that the defendant affirmatively agreed to counsel's stipulation; she just must not dissent from that decision. The opinions of our fellow circuits are in accord. *See United States v. Plitman*, 194 F.3d 59, 64 (2d Cir. 1999) (rejecting the argument that "a defendant in every instance personally must waive the right to confront the witnesses against him" and holding, together with the majority of circuits, that "defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound").

Ceballos conceded at oral argument that *Stephens* applies to her case and binds us under the Fifth Circuit's rule of orderliness, but she urged this Court to reconsider *Stephens* in light of the Supreme Court's intervening opinion in *Crawford v. Washington*, 541 U.S. 36. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth

## No. 13-50786

Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court."). In Ceballos's view, *Crawford* elevated the admission of testimonial hearsay from an evidentiary issue to one of constitutional significance, rendering the right of confrontation personal in nature and not susceptible of waiver by counsel.

Ceballos is correct that *Crawford* set forth the *constitutional* requisites of confrontation and rejected the notion that "the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence." 541 U.S. at 61. But her position rests on two flawed premises: first, that *Stephens* enunciated an evidentiary holding rather than a constitutional one; and second, that *Crawford* effected a change in the law governing waiver of the right of confrontation. In fact, *Stephens* expressly held that "counsel in a criminal case may waive his client's *Sixth Amendment right of confrontation* by stipulating to the admission of evidence." 609 F.2d at 232 (emphasis added). Notably, in reaching this conclusion, we cited the Supreme Court's opinions in *Brookhart v. Janis*, 384 U.S. 1 (1966), and *Diaz v. United States*, 223 U.S. 442 (1912). *Stephens*, 609 F.2d at 232. The Court has never overruled either of these cases, and we see no indication that *Crawford* achieved this object *sub silentio*.[8] Further, we note that two of our fellow circuits have openly held that *Crawford* did not change the contours of confrontation-waiver law,[9] and several others

---

[8] Indeed, the Court in *Crawford* neither cited a single case on waiver nor used the term outside of a single footnote discussing a portion of the state-court opinion on which the Court expressed no view, *see* 541 U.S. at 42 n.1.

[9] *See United States v. Holmes*, 620 F.3d 836, 842–43 (8th Cir. 2010) ("*Crawford* did not change the rule that a defendant can waive his right to confront witnesses by opening the door to the admission of evidence otherwise barred by the Confrontation Clause" (internal quotation marks omitted)); *United States v. Lopez–Medina*, 596 F.3d 716, 733 (10th Cir. 2010) ("[A] defendant can open the door to the admission of evidence otherwise barred by the Confrontation Clause. Other jurisdictions have held, subsequent to *Crawford*, there is no

have continued to apply the *Stephens* rule after *Crawford*.[10] Accordingly, we conclude that *Stephens* remains binding in this circuit, and we decline Ceballos's invitation to revisit that case. *See Jacobs*, 548 F.3d at 378.

In sum, as Ceballos waived her confrontation objection to the admission of Viera's testimony, she cannot now argue that this amounted to error. *See Musquiz*, 45 F.3d at 931.

## B.    The Admission of the Notebook

Ceballos next contends that the district court reversibly erred in admitting the notebook found in her purse, which the Government presented to the jury as a smuggling ledger. Ceballos maintains that the notebook was not properly authenticated under Federal Rule of Evidence 901, and that it contained evidence of bad acts extrinsic to the charged offenses, in violation of Federal Rule of Evidence 404(b).

Although Ceballos filed a pretrial motion in limine to exclude the notebook on relevance, undue prejudice, "other acts," and hearsay grounds, the Court withheld a ruling on admissibility until trial, and Ceballos objected at trial only to the item's authenticity. Thus, we review the authentication issue for abuse of discretion, subject to a harmless-error analysis, *see United States v. El-Mezain,* 664 F.3d 467, 494 (5th Cir. 2011), but we review the Rule 404(b) issue for plain error, *see United States v. Graves*, 5 F.3d 1546, 1551 (5th Cir. 1993). To establish plain error, Ceballos has the burden of proving (1) an error (2) that was "clear or obvious, rather than subject to reasonable dispute" and (3) that affected her "substantial rights." *Puckett v. United States*, 556 U.S. 129, 135 (2009). If she makes these showings, we may use our discretion to remedy the error, but "only

---

Confrontation Clause violation when the defendant opens the door to the admission of hearsay testimony.").

[10] *See United States v. Williams*, 403 F. App'x 707, 708–09 (3d Cir. 2010); *Janosky v. St. Amand*, 594 F.3d 39, 48 (1st Cir. 2010); *United States v. Gonzales*, 342 F. App'x 446, 447–48 (11th Cir. 2009).

No. 13-50786

if [4] the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted). "Meeting all four prongs is difficult, as it should be." *Id.* (internal quotation marks omitted).

### *1.     Authentication*

Authentication of a document is a condition precedent to its admission. *See* Fed. R. Evid. 901(a). "Rule 901(a) 'merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.'" *United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) (quoting *United States v. Watkins*, 591 F.3d 780, 787 (5th Cir. 2009)). Testimony by a witness with knowledge of the item, the item's own distinctive characteristics, and the circumstances of the item's discovery may each suffice to authenticate evidence. *See United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009); *In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008).

Significantly, "[t]his Court does not require conclusive proof of authenticity before allowing the admission of disputed evidence." *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989). Rather, once the proponent has made the requisite preliminary showing of authenticity, the evidence should be admitted, as "[t]he ultimate responsibility for determining whether evidence is what its proponent says it is rests with the jury." *Barlow*, 568 F.3d at 220. Assuming this threshold is met, alleged flaws in authentication "go to the weight of the evidence instead of its admissibility." *Isiwele*, 635 F.3d at 200 (internal quotation marks omitted). Correspondingly, we have recognized that "[t]he standard for authentication is not a burdensome one," *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011), and we have characterized the proponent's burden as "low," *United States v. Lundy*, 676 F.3d 444, 453–54 (5th Cir. 2012).

While we have yet to confront circumstances identical to those at bar, this Court has upheld a finding of authenticity based on evidence that a writing with contents broadly corroborative of the offense charged was discovered in

the defendant's exclusive possession. In *United States v. Wake*, the defendant, on trial for possession of narcotics with intent to distribute, challenged the authentication of items seized from his wallet, his office, and his car. 948 F.2d 1422, 1425, 1434 (5th Cir. 1991). The items included "a sheet with names, code numbers, and telephone numbers"; "a series of tally sheets . . . contain[ing] code numbers, numbers representing quantities of drugs, and amounts of money"; and "notebook pages . . . contain[ing] such statements as 'Have guns out of house', 'throw out calendar sheets', 'What if Mitch or Doug turns me in', and 'can I be indicted'." *Id.* at 1434. The Government authenticated the writings through the testimony of a DEA agent who participated in the criminal investigation. *Id.* The agent "testified as to the circumstances under which each writing was seized from the property or physical possession" of the defendant. *Id.* We found "no error, much less the requisite abuse of discretion," in the district court's admission of the exhibits. *Id.* at 1435. To this end, we noted that authentication may be achieved through circumstantial evidence alone, that the contents of documents may be used to establish the identity of the declarant, and that handwriting analysis is not a prerequisite to authentication. *Id.* at 1434–35.

We, and our colleagues in other circuits, have also found evidence of ledgers maintained in furtherance of conspiracies to be adequately authenticated by their distinctive contents and the circumstances of their discovery—at least when the proponent offers the testimony of a participant in the conspiracy or a witness familiar with its operations. *See United States v. Arce*, 997 F.2d 1123, 1127–28 (5th Cir. 1993) (holding that records were properly authenticated as drug ledgers maintained by a co-conspirator based on evidence that the records were recovered from the co-conspirator's home, testimony of a witness as to the handwriting on the ledgers and the similarity of the ledgers to others maintained by the co-conspirator, and evidence that

notations in the ledgers corresponded to known transactions); *United States v. De Gudino*, 722 F.2d 1351, 1355–56 (7th Cir. 1983) (holding that records were properly authenticated as the ledgers of a human-smuggling ring based on evidence that the records were seized from its "headquarters" and on "testimony outlining the smuggling techniques of the operation," which, together with the contents of the records, indicated authorship by a participant).[11]

Here, the Government sought to introduce the notebook as a ledger recording Ceballos's smuggling activities. In the hearing on Ceballos's motion in limine, Government counsel made a proffer of the foundational testimony he expected to elicit. Noting that "the Border Patrol officers that are involved in this case have wide experience with alien smuggling organizations," counsel declared that he "plan[ned] on eliciting some testimony that this looks like to them [it] could . . . possibly be a ledger, a record of alien smuggling activities." After recounting the facts of the notebook's discovery, counsel described some of the contents of the notebook and tied them to the Government's theory of the case. Counsel cited the notation "Enrique owes me $25" and observed that Ceballos's cell phone records reflected that she was engaged in a call with a contact named Enrique at the time Agent Torres approached Ceballos's car and presented himself as Viera. Counsel also pointed to the reference to "José" and remarked that Ceballos's phone records revealed calls with a contact named

---

[11] Ceballos directs our attention to a more recent case, *United States v. Jackson*, 636 F.3d 687 (5th Cir. 2011), in which this Court distinguished *Arce* and found drug ledgers improperly authenticated. However, *Jackson* addressed whether the ledgers "were properly authenticated *as business records*" exempt from the rule against hearsay under Federal Rule of Evidence 803(6). *Id.* at 693 & n.3 (emphasis added); *see also United States v. Young*, 753 F.3d 757, 774 (8th Cir. 2014) (holding that *Jackson* had no application to an authenticity challenge under Rule 901 because, *inter alia*, "the proponent in *Jackson* attempted to introduce the ledger under the business-records exception to the hearsay rule, which requires establishment of a different foundation before admission"), *cert. denied*, 135 S. Ct. 986 (2015).

Whether the notebook in Ceballos's possession contained inadmissible hearsay is not at issue on appeal: Ceballos has abandoned this claim of error through inadequate briefing. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

"José ex" on the day of her arrest. In addition, counsel indicated that he saw the authorship of the notations as immaterial:

> We think [Ceballos] did write it, but let's say for argument['s] sake that we can't prove that she specifically wrote it. Nevertheless, having a record or a ledger of alien smuggling activities is highly probative. In this case, it was in her purse, an item that is highly personal. It's in close proximity in space and time to her. It's close in space and time to the crime that was committed.

Notably, the record reflects that the district court was able to examine a copy of the notebook during the hearing.

At trial, the Government offered as foundation the testimony of Agent Amaya, who handled Ceballos's possessions following her arrest. Eliminating the testimony to which Ceballos timely objected, the following relevant evidence was before the district court at the time it ruled to admit the notebook. Agent Amaya discovered a notepad in Ceballos's purse. The purse also contained identifying documents, including pay stubs bearing Ceballos's name. The notebook "appeared to be a ledger." Agent Amaya was looking for items with "evidentiary value," including "notes that can be in names, telephone numbers, any kind of evidence . . . that can prove that . . . maybe she was a pick-up driver and she's involved in the smuggling scheme." Names and dollar amounts would be particularly important to this task. Agent Amaya referred Ceballos's notebook to a field intelligence agent, and made copies of the notebook for evidence, because he thought it "was noteworthy." There was no indication that anyone other than Ceballos used the purse, and the purse contained items that one would expect to find in a purse.

Although the issue is close, we cannot say that the district court abused its discretion in finding the notebook properly authenticated. The Government did not need to adduce "conclusive proof of authenticity," *Jimenez Lopez*, 873 F.2d at 772; it needed only "evidence sufficient to support a finding that the

15

item [was] what [it] claim[ed]," Fed. R. Evid. 901(a)—a ledger recording smuggling activity in which Ceballos was involved. Here, as in *Wake* and *Arce*, the evidence was found in the defendant's exclusive possession: the notebook was recovered from Ceballos's purse, which was inside her car at the time of her arrest. In addition, the contents of the notebook, which the court was able to examine at the motion in limine hearing, provide some corroboration of the alleged criminal activity. The notebook includes references to money owed to individuals named "José" and "Enrique," both the names of contacts in Ceballos's phone and both the subjects of calls with Ceballos around the time of her arrest. It lists "guy" and "girl" next to individual dollar amounts and days of the week, and it contains notations such as "pick up," "deliver," "food," and "bring her," also alongside dollar amounts.

While these notations are not as distinctive—or as self-evidently inculpatory—as those in *Wake*, and the Government did not offer testimony from the author of the notebook or from any co-conspirator, as in *Arce* and *De Gudino*, the contents of the notebook are generally consistent with a ledger recording smuggling activity. Indeed, despite omitting any explicit reference to the substance of the writings, Agent Amaya's foundational testimony supports this characterization. That the Government neglected to present handwriting analysis is not dispositive; not only has this Court disclaimed the notion that such evidence is a prerequisite to authenticating a writing, *Wake*, 948 F.2d at 1435, but as the Government expressed at the motion-in-limine hearing, Ceballos's possession of the notebook, and its potential corroboration of smuggling activity, render the authorship of the writing less important than Ceballos maintains. Further, we are mindful of the principle that once the proponent has made a preliminary showing of authenticity, "[t]he ultimate responsibility for determining whether evidence is what its proponent says it is rests with the jury." *Barlow*, 568 F.3d at 220. After the notebook was

admitted, Ceballos was able to present competing evidence that the notebook was in fact a personal ledger documenting innocuous matters—bills, reminders, and notes from conversations—and it was the province of the jury to credit one account over the other.

In view of the deferential abuse-of-discretion standard and the "low" burden of authentication, *Lundy*, 676 F.3d at 453, we see no reversible error in the district court's finding of authenticity.

### 2.    *Rule 404(b) Extrinsic-Acts Evidence*

Evidence pertaining to a defendant's uncharged crimes, wrongs, or acts is considered *intrinsic* to the charged offense and is generally admissible if "it and evidence of the crime charged are inextricably intertwined, or both acts are part of a single criminal episode, or [the uncharged act] was a necessary preliminary to the crime charged." *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007). Such evidence "is admissible to complete the story of the crime by proving the immediate context of events in time and place . . . and to evaluate all of the circumstances under which the defendant acted." *United States v. Rice*, 607 F.3d 133, 141 (5th Cir. 2010) (citations and internal quotation marks omitted). In the context of a conspiracy, evidence is intrinsic to the underlying offense "if it is relevant to establish how the conspiracy came about, how it was structured, and how the [defendant] became a member." *United States v. Watkins*, 591 F.3d 780, 784 (5th Cir. 2009). And, plainly, "[a]cts committed in furtherance of the charged conspiracy are themselves part of the act charged" and therefore qualify as intrinsic evidence. *United States v. Garcia Abrego*, 141 F.3d 142, 175 (5th Cir. 1998).

By contrast, when evidence of a defendant's uncharged crimes, wrongs, or other acts is *extrinsic* to the offense, the admission of that evidence is limited under Rule 404(b). *See Sumlin*, 489 F.3d at 689. Although inadmissible to prove the defendant's character, extrinsic evidence "may be admissible for

another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

Regardless of whether the evidence qualifies as intrinsic or extrinsic, Ceballos has not shown plain error in the admission of the notebook. First, there is a strong basis to conclude that the contested evidence was intrinsic to the charged conspiracy offense. Ceballos was tried for, and convicted of, conspiracy to transport illegal aliens for private financial gain "on or about December 18, 2012." As explained above, the notepad contains writing broadly corroborative of the Government's account of the offense and consistent with a smuggling operation. These notations, which include references to "José" and "Enrique," an accounting of fees and expenses, and obligations to "pick up" and "deliver" subjects, appear "relevant to establish . . . how the conspiracy was structured," *Watkins*, 591 F.3d at 784, and may even evince "[a]cts committed in furtherance of the charged conspiracy," *Garcia Abrego*, 141 F.3d at 175. Further, at least one page bears a connection to the date listed in the indictment (Tuesday, December 18, 2012): it includes the notations "12-16-12," "M-T-W," and "entre couple Tuesday."

Second, even if the notations refer to bad acts other than those charged, Ceballos cannot show their admission was error that is "clear or obvious, rather than subject to reasonable dispute," *Puckett*, 556 U.S. at 135. The acts described in the notebook at least arguably serve a permissible evidentiary purpose under Rule 404(b)—proving intent, preparation, plan, or knowledge, relating to both the conspiracy and the attempt to transport illegal aliens for private financial gain. As a result, Ceballos has not discharged her heavy burden to show plain error, and we hold that the district court did not err in admitting the notebook.

## C.    Cumulative Error

In her final point, Ceballos asserts that the above evidentiary errors, coupled with "three blatant instances of comment upon Ceballos's invocation of her rights" and "improper personal attacks against Ceballos by the prosecutor during closing argument," deprived her of a fair trial.

"Cumulative error justifies reversal only when errors so fatally infect[ed] the trial that they violated the trial's fundamental fairness." *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (en banc) (internal quotation marks omitted). "We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that 'the possibility of cumulative error is often acknowledged but practically never found persuasive.'" *Id.* (footnote omitted) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)). A cumulative-error claim requires this Court to "evaluate the number and gravity of the errors in the context of the case as a whole." *United States v. Valencia*, 600 F.3d 389, 429 (5th Cir. 2010). And, of course, "non-errors have no weight in a cumulative error analysis." *Delgado*, 672 F.3d at 344.

### *1.*    **Doyle *Errors***

Ceballos argues that, on three occasions, Government witnesses improperly testified that she invoked her rights to counsel and to remain silent. In particular, she challenges the comments below as violations of *Doyle v. Ohio*, 426 U.S. 610 (1976). As Ceballos failed to object in all instances, our review is again for plain error. *See United States v. Andaverde–Tinoco*, 741 F.3d 509, 518 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1912 (2014).

#### *a.*    *Direct Examination of Agent McCarthy*

During Agent McCarthy's direct testimony, Government counsel asked whether Ceballos told the agent anything during or after her arrest. Agent McCarthy explained that once Ceballos was out of her vehicle, he recited her

No. 13-50786

*Miranda* rights in Spanish and asked whether she understood her rights and whether she was willing to speak with or without an attorney present. According to Agent McCarthy, after he repeated the question, another agent approached and asked Ceballos whether or not she wanted an attorney. Agent McCarthy testified that Ceballos "answered that, yes, she did want an attorney, then all incriminating questions were stopped."

### b.    *Cross-Examination of Agent McCarthy*

Defense counsel also questioned Agent McCarthy regarding his initial approach and questioning of Ceballos. Specifically, counsel asked Agent McCarthy whether he asked "[Ceballos] if she wanted to make any statements." Agent McCarthy responded:

> I asked her what she was doing there.  She said she was there to collect child support. . . . That's when I went ahead and Mirandized her. And the Defendant at first was very evasive in answering the question whether she understood her rights. . . . [A]s I testified earlier, she finally said she understood her rights and she was . . . not willing to make any statements without her attorney present.

At this point, Agent McCarthy placed Ceballos in the CBP vehicle.

### c.    *Cross-Examination of Agent Contreras*

Defense counsel questioned Agent Contreras regarding the procedure for determining what information is included in a CBP report, prompting the following exchange:

> Q. And when you're putting your report together and you're talking about an initial arrest, do you get to ask your agents, tell me what statements were made by the Defendant at the arrest site?
>
> A. When I spoke to the agents, I asked them what happened.  They gave me everything that occurred, but I don't recall getting that information until later when we spoke with the AUSA.  Everything that I was told by the agents when I spoke to them, the last I remember is that she invoked her right to counsel, of what they said and from what I saw in the report.

20

####### d.    Analysis

A defendant's rights are violated when the prosecutor comments on the fact that a defendant has chosen to remain silent following her arrest and receipt of the *Miranda* warnings. *See Doyle*, 426 U.S. at 617–18. "A prosecutor's or witness's remarks constitute comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark." *United States v. Carter*, 953 F.2d 1449, 1464 (5th Cir. 1992). "Both the intent of the prosecutor and the character of the remarks are determined by reviewing the context in which they occur, and the burden of proving such intent is on the defendant." *United States v. Laury*, 985 F.2d 1293, 1303 (5th Cir. 1993) (quoting *United States v. Shaw*, 701 F.2d 367, 381 (5th Cir. 1983) (citations omitted)).

Ceballos has not shown any *Doyle* error that was "clear or obvious," *Puckett*, 556 U.S. at 135. In his opening remarks, Ceballos's counsel mentioned multiple times that Ceballos invoked her rights to silence and to counsel. Counsel also commented on Ceballos's defense, including her belief—expressed at the time of her arrest—that she had been set up by her ex-husband in a ploy to avoid his child-support obligations. Accordingly, the Government had reason to question Agent McCarthy regarding Ceballos's statements at the time of her arrest: to test whether Ceballos advised the agents of the misunderstanding and of the plot against her. As a result, we cannot say that Ceballos has discharged her burden, on plain error, to establish that the direct-examination testimony was "manifest[ly] inten[ded]" to comment on her silence or was of such a character as to lead the jury "naturally and necessarily" to so construe it, *Carter*, 953 F.2d at 1464. *See also United States v. Whitaker*, 592 F.2d 826, 830 (5th Cir. 1979) (finding no *Doyle* violation where prosecutor intended for the witness to comment on actual statements made by the defendant yet

21

inadvertently caused the witness to comment on the defendant's silence). Further, given the substance of his opening statement, defense counsel at least arguably opened the door to the challenged testimony. *See, e.g., United States v. Martinez–Larraga*, 517 F.3d 258, 268 (5th Cir. 2008) (recognizing an exception to *Doyle* that permits a prosecutor to reference a defendant's post-*Miranda* silence in order to respond to some contention of the defendant concerning her post-arrest behavior).

As for the testimony on cross-examination, not only were the objectionable statements elicited by defense counsel rather than by the Government, but they were directly responsive to the questions posed. The question to Agent McCarthy was whether he asked "[Ceballos] if she wanted to make any statements," and the question to Agent Contreras pertained to the process of completing a CBP report—including, critically, how and why the report came to omit Ceballos's statement to Agent McCarthy that she had been at the location to collect child support. In neither case can we say, through the prism of plain error, that the manifest intent of the witness's remarks, or their natural and necessary construction, was to comment on Ceballos's silence in a way that improperly implied her guilt. *See Carter*, 953 F.2d at 1464.

### 2.    *Improper Closing Argument*

Ceballos next complains of the following remarks by Government counsel during closing argument:

> The Defense has argued that the Defendant is an honest person and a person of integrity and a hard worker. Well, she may very well be a hard worker, certainly working at 7-11 long hours. It sounds like an honest day[']s pay for an honest day's work, and that is to be admired. Now, ladies and gentlemen, moonlighting, trying to get a quick buck, is not honorable. It's not something a person with integrity does.
>
> She is not the embodiment of the immigrant that we want in this country. There are people lined up for miles and miles to get into this country, to afford themselves of the benefits that she has.

No. 13-50786

> She chose to try to make a quick buck by transporting undocumented aliens.
>
> . . . .
>
> . . . She is not the ideal immigrant that we want more of in this country.

Ceballos avers that these comments become "suspect" when viewed together with the "opening tone of the case set by the trial judge." In support, she points to statements by the district court, immediately after the jury was impaneled, announcing the court's intention to screen a brief video honoring veterans and extolling the virtues of citizenship. Specifically, the court stated: "[S]o many of the freedoms that we enjoy in this country, and there are many in serving on this bench, I'm reminded every day how wonderful it is to be a citizen of the United States." The court also invited veterans in the courtroom to stand and be recognized, and Ceballos contends that one of the prosecutors rose. Again, Ceballos lodged no objections, so our review is for plain error. *See United States v. Reagan*, 725 F.3d 471, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1514 (2014).

"[A] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *Id.* (internal quotation marks omitted). "Except to the extent the prosecutor bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses." *United States v. Alaniz*, 726 F.3d 586, 616 (5th Cir. 2013) (internal quotation marks omitted).

This Court looks at the challenged "closing argument in the context of the trial as a whole, recognizing that inappropriate prosecutorial comments, standing alone[,] will not justify reversal of a conviction obtained in an otherwise fair proceeding." *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007) (alterations and internal quotation marks omitted). The ultimate

inquiry on review is "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id.* (internal quotation marks omitted). To answer this question, we consider "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Id.* (internal quotation marks omitted). We "assume that a jury has the common sense to discount the hyperbole of an advocate, discounting the force of the argument," *United States v. Vaccaro*, 115 F.3d 1211, 1216 (5th Cir. 1997), and we consider whether the argument had some foundation in the record and whether it responded to an argument presented by the defense, *see id.*

Ceballos has not demonstrated, for purposes of our stringent plain-error review, that the prosecutor's closing remarks were clearly improper—no less that they cast serious doubt on the correctness of the verdict. *See Thompson*, 482 F.3d at 785. As the Government observes, the defense's summation focused on Ceballos's good character, portraying her as an honest, hardworking legal immigrant with integrity who was an easy target for her ex-husband José. In fact, defense counsel described Ceballos as "the embodiment of the spirit we need here in America" and "the kind of person that America wants in the United States." Viewed in context, the Government's remarks constituted proper rebuttal, seeking to focus the jury not on its sympathy for Ceballos but instead on her disregard for the country's immigration laws. *See Vaccaro*, 115 F.3d at 1216. Moreover, even if the comments were improper, they were presumptively cured by the district court's jury charge, which instructed the jury to "base [its] verdict solely upon the evidence without prejudice or sympathy" and advised the jury that argument by counsel was not evidence. *See Reagan*, 725 F.3d at 492 ("[T]he district court can purge the taint of a prosecutor's prejudicial comments with a cautionary instruction, even, in some

cases, one that is merely generic." (quoting *United States v. Turner*, 674 F.3d 420, 439–40 (5th Cir. 2012) (internal quotation marks omitted)).

Ceballos's argument concerning the "opening tone of the case" is unavailing as well. Not only is the record devoid of evidence to corroborate Ceballos's description of the video and her allegation that a prosecutor received recognition as a veteran, but, as the Government points out, the trial took place one week after Memorial Day—a national holiday commemorating military service. Further, the district judge's remarks followed voir dire, which concluded with the judge's expression of gratitude to the venire panel for their civic service. While we do not condone the district court's decision to air a patriotic video before a criminal trial on charges of transporting illegal aliens for financial gain, we cannot say that this—either alone or in combination with the other alleged improprieties—plainly violated Ceballos's right to a fair trial. *See Delgado*, 672 F.3d at 344.

As we have rejected each of Ceballos's claims of error, the cumulative-error doctrine has no application to this case. *See id.*

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Ceballos's conviction.